CHARLES WEBER COMPANY

MAY 5, 2015

TO:  TESORO FAR EAST MARITIME COMPANY SA

ATTN: DAMIAN CANDELET

TO:  HEIDMAR

ATT: JOE GARIN

REF: DA YUAN HU / TESORO – CP 5/5/15

WE ARE PLEASED TO CONFIRM THE FOLLOWING FIXTURE FOR ACCOUNT TESORO MARITIME COMPANY ON THE BELOW TERMS AND CONDITIONS WITH ALL SUBJECTS LIFTED.

CHARTERER        : TESORO FAR EAST MARITIME COMPANY OR

             IT'S GUARANTEED NOMINEE

DISPONENT OWNER    : BLUE FIN TANKERS INC.

             20 GLOVER AVENUE,

             NORWALK CT

             USA 06850

             TEL: +1-203-662-2660

             EMAIL: BULLETIN@HEIDMAR.CO

COMMERCIAL OPERATOR : HEIDMAR INC.

      20 GLOVER AVENUE

      NORWALK, CT 06850

      TEL: +1 203 662 2620

      EMAIL: BULLETIN@HEIDMAR.COM

BROKER     : CHARLES R. WEBER COMPANY. INC.

C/P FORM     : EXXONMOBILVOY 2000

C/P DATED     : MAY 5, 2015

TESORO VOY #     : DAYU - 1501

==================

VESSEL DESCRIPTION:

==================

VESSEL     : DA YUAN HU

IMO NUMBER:     : 9259733

EX-NAME     : NOT APPLICABLE

SDWT          : 159,149 MT

SDRAFT        : 17.30 M

LOA           : 274.70 M

BEAM          : 48.034 M

FLAG          : CHINA

BUILT         : JUNE 20, 2004

CLASS         : CHINA CLASSIFICATION SOCIETY

STOPPERS      : 2 X 200 MT - TONGUE TYPE

CHAIN SIZE    : 76 MM

CUBIC 98 PCT  : 176,325.826 M3

SLOP 98 PCT   : 3451.266 M3

SEGREGATIONS  : 3

PUMPS         : 3 X 3500 CU. METRES/HOUR (CENTRIFUGAL)

TPC           : 119 MT

BCM           : 139.30 M

KTM           : 54.44 M

IGS           : YES

COW           : YES

SBT/CBT       : SBT

VRS           : YES

GRT           : 84855

NRT           : 52153

PCNT          : N/A

SCNT          : 79866.50

DERRICKS/CRANES    : 2 x 15 TONNES, PORT & STARBOARD

COATED        : MODIFIED EPOXY

HULL          : DOUBLE HULL

CALL SIGN     : BOGH

P AND I       : STEAMSHIP

QUALIFIED IND     : OBRIEN OIL POLLUTION SERVICES

OSRO          : NATIONAL RESPONSE CORPORATION

COC/TVEL      : SEPT 20, 2016

ISPS          : JUN 10, 2019

APPROVALS     : TTBOOK VSL APPROVED BY SHELL/ CEPSA/ P66/ IMT/ KOCH/ REPSOL/ CHEVRON

LAST SIRE     : FEB 14 2015 / HUELVA, SPAIN

LAST CARGO    : LULU CRUDE / ENAP / LA PALOMA - SAN VICENTE

2ND LAST      : BONNY CRUDE / VITOL / OFFSHORE LOME - JOSE IGNACIO

3RD LAST      : NIGERIAN OKONO BLEND

ITINERARY:  VESSEL FREE OF CARGO 5AN VICENTE. ETA AFTER LIFTING SUBS AT 12.5 KNOTS IS MAY 15TH.

(B) LAYDAYS:  MAY 14-15, 2015 (0001-1600)

(C) LOADING RANGE:  1/2 SAFE PORT(S) WC PANAMA - INT PUERTO ARMUELLES

(D) DISCHARGING RANGE:  1/2 SAFE PORT(S)USWC (LA-SF RANGE)

(E) CARGO QUANTITY: PC MINIMUM 130,000 METRIC TONS CHARTERER'S OPTION TO FULL CARGO, NO DEADFREIGHT CHARTERER'S ACCOUNT PROVIDED MINIMUM QUANTITY SUPPLIED.

(F) CARGO DESCRIPTION: CRUDE OIL - NO HEAT - MAX 3 GRADES WVNS.

(G) FREIGHT RATE: WS 110

OVERAGE:  IF ANY AT 50 PERCENT

(H) FREIGHT PAYABLE TO: IN USD VIA TELEGRAPHIC TRANSFER TO OWNERS DESIGNATED BANK ACCOUNT AS FOLLOWS:

OWNER'S BANK ACCOUNT AS FOLLOWS:

BANK OF NEW YORK

ABA: 021000018 - SWIFT CODE: IRVTUS3N

FOR CREDIT TO DNB NOR BANK ASA,

NEW YORK SWIFT CODE DNBAUS33

ACCT NBR: 19584001 - REF: BLUE FIN TANKERS INC

(I) LAYTIME:  72 HOURS

(J) CP SPEED: VESSEL TO PERFORM LADEN VOYAGE AT 12.5 KNOTS WSNP

(K) DEMURRAGE: USD 42,000 PDPR

(L) COMMISSION: 1.25 PCT ADDRESS TO CHARTERERS AND

      1.25 PCT TO CHARLES R. WEBER COMPANY, INC. ON FREIGHT, DEADFREIGHT AND DEMURRAGE.

****TERMS AS PER LAST DONE DA LI HU / TESORO – CP 4/1/14 AS FOLLOWS***

SPECIAL PROVISIONS:

------------------

1. . OWNER CONTACT INFORMATION:

    MAIN OPERATIONS CONTACT:

    NAME : DARIN RUPINSKI

    OFFICE TELEPHONE NUMBER : 1-203-662-2660 (24 HRS)

    OFFICE FAX NUMBER : 1-203-662-2783

    E-MAIL : BULLETIN@HEIDMAR.COM

    DIRECT: 1-203-662-2664

    MOBILE NUMBER : 1-203-434-4119

    PVT EMAIL: Darin.Rupinski@heidmar.com

2. OWNER WARRANTS VESSEL TO ARRIVE AT LOADPORT WITH LESS THAN 5 PPM H2S IN ALL CARGO TANKS.

3. NORTH AMERICAN ECA CLAUSE: NA ECA AS PER WS 2015.

CHARTERER TO PAY THE WORLDSCALE SPECIFIED DIFFERENTIAL (USD/ MILE) OF THE ACTUAL VOYAGE (LADEN CONDITION ONLY) BASED ON THE GREATER OF CHARTERER'S OR CUSTOMARY ROUTING AND SUPPORTED BY MASTER'S STATEMENT. NA ECA IS PAYABLE ON THE SAME TERMS AS FREIGHT BUT BY SEPARATE INVOICE.

4. WSHTC

ADDITIONAL CLS'S

ANY TAXES A/O DUES ON FREIGHT A/O CARGO INCL THOSE MENTIONED IN WS AS BEING FOR CHARTS ACCOUNT ALL TO BE FOR CHARTS ACCOUNT AND SETTLED DIRECTLY BY THEM

ANY STS COSTS (SUBJECT BUT NOT LIMITED TO PORT COSTS, AGENCY COSTS, STS EQUIP COSTS, TOWAGE) TO BE FOR CHARTS ACCT AND SETTLED BY THEM DIRECTLY

HEIDMAR WEATHER CLAUSE

IF VESSEL LOADS AND/OR DISCHARGES AT ANY OFFSHORE MOORING, BARGE-TO-SHIP/ SHIP-TO-SHIP TRANSFER/LIGHTERING, SEA BERTH/SEA LINE OR BERTH EXPOSED TO ADVERSE WEATHER OR SEA CONDITIONS, ANY DELAYS DUE TO BAD WEATHER AND/OR SEASWELL, FOG OR ANY OTHER PREVAILING CONDITIONS IS TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF VSL IS ON DEMURRAGE. SHOULD THE MASTER, PILOT OR ANY LOCAL AUTHORITY DEEM IT NECCESSARY TO HAVE TUGS STANDING-BY, SHIFT/UNBERTH/REBERTH THE VESSEL, OR REQUIRE ANY OTHER ADDITIONAL EQUIPMENT OR SERVICES TO MAINTAIN THE SAFETY OF THE VESSEL AND/OR MOORING EQUIPMENT, THEN ANY AND ALL SUCH ADDITIONAL EXPENSES INCURRED TO BE FOR CHRTRS ACCT AND SETTLED DIRECTLY BY THEM

CHARTER PARTY FORM: EXXONMOBIL VOY 2000, TERMS AND CONDITIONS TO APPLY WITH FOLLOWING

AMENDMENTS/ADDITIONS:

EXXONMOBIL VOY 2000 PART II

------------------------

CLS 1 - (D) LINE 10 DELETE "WITH GANGWAY DOWN".

CLS 3 - (B) DELETE

CLS 4 - (B) DELETE THE WORD "TELEX" FROM LINE 54 ADD "EMAIL AND/OR FACSIMILE".

CLS 13 - (C) DELETE AFTER "EFFECTED", FROM LINE 174 TO 176 AND ADD "PROVIDED ALWAYS THAT IF THE VESSEL IS DETAINED SOLELY FOR THE PURPOSES OF AWAITING CARGO DOCUMENTS AT LOADPORT FOR MORE THAN THREE(3) HOURS BEYOND THE FINAL DISCONNECTION OF CARGO HOSES, LAYTIME OF IF THE VESSEL IS ON DEMURRAGE, DEMURRAGE SHALL RECOMMENCE AFTER SUCH PERIOD OF THREE(3) HOURS AND TERMINATE UPON THE COMPLETION OF CARGO DOCUMENTATION. IF, AFTER COMPLETION OF LOADING OR DISCHARGING,THE VESSEL IS REQUIRED TO PROCEED TO AN ANCHORAGE FOR CHARTERERS' PURPOSES, THEN THE TIME SPEND MOVING FROM THE BERTH TO THE ANCHORAGE SHALL NOT COUNT AS PART OF THE THREE(3) HOURS REFERRED TO ABOVE OR AS LAYTIME, IF THE VESSEL IS ON DEMURRAGE, AS DEMURRAGE."

CLS 14 - (C) ADD AT END: IF BUNKERING DOES NOT INTERFER WITH BERTHING THEN TIME BUNKERING TO COUNT AS LAYTIME OR IF ON DEMURRAGE, DEMURRAGE.

CLS 18 - (D) LINE 336, AFTER "VESSEL", INSERT "BEFORE LOADING OR", AFTER "PIPELINES" INSERT "OR FLOATING HOSES".

AFTER "WATER", INSERT "OR CPP SUPPLIED BY TERMINAL".

LINE 337, ADD AT THE END," OWNER SHALL NOT BE HELD RESPONSIBLE FOR THE DISCOLORATION OR ANY OTHER CONSEQUENCES RELATED TO THIS PARTICULAR OPERATION".

CLS 18 - (F) LINE 340 INSERT "HOMOGENEIOUS" AFTER ENTIRE, DELETE "BE IT ONE OR MORE GRADES"

LINE 340 INSERT "AVERAGE" AFTER "MAINTAIN".

LINE 341 AFTER "DISCHARGE", ADD "EXCLUDING STRIPPING (MAX STRIPPING 3 HOURS)".

CLS 18 - (H) LINE 360, AFTER "DETERMINED BY" DELETE "MUTUALLY AGREEABLE", AND ADD "THE RECEIVER'S CURRENTLY EMPLOYED INDEPENDENT INSPECTOR".



CLS 25 - LINE 418, AFTER "NEXT TAKEN" ADD "IF THE CARGO FOR THE RESPECTIVE CHARTER PARTY IS A NO HEAT CARGO AS DESCRIBED IN PART II F) OF EXXONMOBILVOY 2000, THE CHARTERER SHALL HAVE THE OPTION TO INCREASE THE CARGO TEMPERATURE UP TO 130 DEGS FAHRENHEIT FOR DISCHARGE. CHARTERERS SHALL PAY FOR THE ADDITIONAL BUNKERS CONSUMED SOLELY DUE TO THE INCREASE IN TEMPERATURE AS AFORESAID.

THE PRICING FOR THE ADDITIONAL BUNKERS SHALL BE AT THE OWNER'S DOCUMENTED LAST TAKEN ACTUAL COST FOR SUCH BUNKERS AT THE PORT WHERE BUNKERS ARE LAST TAKEN" CHARTS TO INCLUDE HEATING INSTRUCTIONS IN VOYAGE ORDERS.

CLS 26 - DELETE

CLS 27 - (C) DELETE ALL FROM LINES 480 TO LINE 490.

CLS 33 - DELETE (A),

INSERT IN PLACE OF (A) 'OWNER TO COMPLY WITH LATEST IMO AND PORT STATE REGULATIONS'

CLS 36 - LINE 658, AFTER '90 DAYS' INSERT '90 DAYS FOR DEMURRAGE, 120 DAYS FOR ALL OTHER CLAIMS'

THE FOLLOWING TESORO FAR EAST MARITIME COMPANY CLAUSES AS WRITTEN OCTOBER 2004 (EFFECTIVE 1 NOVEMBER

2004) ARE HEREBY INCORPORATED INTO THIS CHARTER PARTY, AS AMENDED:

1. PRIVACY - OK

2. ADDITIONAL CARGO INSURANCE - N/A FOR THIS VOYAGE

3. ADDRESS COMMISSION - OK

4. SEA TERMINAL/SPM MOORING CLAUSE - OK

5. MOORING MASTER CLAUSE – APPLICABLE FOR HAWAII ONLY

6. VOYAGE ORDERS ADD "AND CHARTERERS ISSUED VOYAGE ORDERS MUST ALWAYS BE IN COMPLIANCE WITH ALL TERMS IN REFERENCED RECAP AND/OR CHARTER PARTY"

7. IN TRANSIT LOSS PARA. 1 - DELETE '0.3', INSERT '0.5'.

PARA. 2 - DELETE LAST SENTENCE "CARGO QUANTITIES....SHALL BE CONCLUSIVE".

8. BUNKER CLAUSE DELETE PARA 2. (B) PARA 3. (C) AFTER "AS LAYTIME" INSERT "SHOULD THE SAID OPERATION DELAY VESSEL"

9. CARBON BLACK CLEANING CLAUSE DELETE - OK

10. DEMURRAGE/EXPENSE LINE 3, AFTER "BUT NOT LIMITED" DELETE "TO ETA NOTICES...

11. SAMPLE AND SURVEY - OK

12. ITF - DELETE ENTIRE CLAUSE AND INSERT "VESSEL IS ITF OR EQUIVELENT"

13. CARGO TRANSFER - OK

I) POSSESS A SCAC (STANDARD CARRIER ALPHA CODE);

II) POSSESS AN ICB (INTERNATIONAL CARRIER BOND); AND

III) SUBMIT A CARGO DECLARATION BY AMS (AUTOMATED MANIFEST SYSTEM) TO THE US CUSTOMS.

CHARTERER SHALL PROVIDE ALL NECESSARY INFORMATION TO THE OWNERS AND/OR THEIR AGENTS TO ENABLE THE OWNERS TO SUBMIT A TIMELY AND ACCURATE CARGO DECLARATION.

CHARTERER SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OWNERS AGAINST ANY LOSS AND/OR DAMAGE WHATSOEVER AND/OR ANY EXPENSES, FINES, PENALTIES AND ALL OTHER CLAIMS OF WHATSOEVER NATURE, INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE CHARTERER'S FAILURE TO COMPLY WITH ANY OF THE PROVISIONS OF THIS SUB-CLAUSE. SHOULD SUCH FAILURE RESULT IN ANY DELAY THEN, NOTWITHSTANDING ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY, ALL TIME USED OR LOST SHALL COUNT AS LAYTIME OR, IF THE VESSEL IS ALREADY ON DEMURRAGE, TIME ON DEMURRAGE.

OWNERS SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE CHARTERER AGAINST ANY LOSS AND/OR DAMAGE WHATSOEVER (INCLUDING CONSEQUENTIAL LOSS AND/OR DAMAGE) AND ANY EXPENSES, FINES, PENALTIES AND ALL OTHER CLAIMS OF WHATSOEVER NATURE, INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE OWNERS' FAILURE TO COMPLY WITH ANY OF THE PROVISIONS OF SUB-CLAUSE (A). SHOULD SUCH FAILURE RESULT IN ANY DELAY THEN, NOTWITHSTANDING ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY, ALL TIME USED OR LOST SHALL NOT COUNT AS LAYTIME OR, IF THE VESSEL IS ALREADY ON DEMURRAGE, TIME ON DEMURRAGE.

THE ASSUMPTION OF THE ROLE OF CARRIER BY THE OWNERS PURSUANT TO THIS CLAUSE AND FOR THE PURPOSE OF THE US CUSTOMS REGULATIONS (19 CFR 4.7) SHALL BE WITHOUT PREJUDICE TO THE IDENTITY OF CARRIER UNDER ANY BILL OF LADING, OTHER CONTRACT, LAW OR REGULATION.

IF REQUESTED BY CHARTERER, OWNER TO PROVIDE A COPY OF THEIR INTERNATIONAL CARRIER BOND FORM WITHIN 5 WORKING DAYS AFTER THE VESSEL IS FIXED OR 5 DAYS BEFORE ARRIVAL DISCHARGE PORT WHICHEVER IS EARLIER. IF OWNERS ARE UNABLE TO COMPLY IN A TIMELY MANNER, CHARTERER'S WILL INFORM OWNER AND PROCEED TO INSTRUCT DESIGNATED 3RD PARTIES TO ARRANGE AND FILE ON OWNERS BEHALF. COST AND TIME, INCLUDING ANY DELAYS ASSOCIATED WITH THESE REQUIREMENTS, WILL BE FOR OWNERS ACCOUNT AND TO BE SETTLED DIRECTLY BY THEM.

THIS ACTION DOES NOT RELIEVE THE OWNER OF THEIR OBLIGATION UNDER THIS CLAUSE.

OWNERS WILL ADVISE BOND NUMBER/EXPIRY DATE.

15. FPSO CLAUSE – DELETE, N/A THIS VOYAGE

16. NOTICES - OK

17. OCEANROUTES - DELETE

18. BIMCO STANDARD ISM CLAUSE - OK

19. ALASKA CLAUSE - DELETE

20. HYDROGEN SULPHIDE (H2S) - LAST PARA. DELETE "A REASONABLE TIME" AND INSERT "A PERIOD EQUAL TO AGREED LAYTIME"

21. PART CARGO (DEMURRAGE) - DELETE

22. CLEARANCE - ADD AT END "HOWEVER, WHERE THE VESSEL IS INSTRUCTED TO WAIT AT ANCHORAGE, AND IT IS NOT CUSTOMARY TO GRANT PORT CLEARANCE AT ANCHORAGE, THIS CLAUSE WILL NOT APPLY UNTIL SUCH TIME AS CLEARANCE IS CUSTOMARILY GIVEN/REJECTED."

23. SPEED - 1ST PARA. ONLY, INSERT "12.5 KTS WSNP"

24. ADDITIONAL LOAD/DISCHARGE PORT(S) - DELETE N/A

25. JAPAN CLAUSE - DELETE

26. KOREA CLAUSE - DELETE

27. CHARTER PARTY ADMINISTRATIVE CLAUSE - OK

28. QUESTIONNAIRE(S) - OK

29. ISPS CLAUSE FOR VOYAGE CHARTER PARTIES - OK

30. CERTIFICATE OF COMPLIANCE (COC) -OK

SEA TERMINAL / SPM MOORING CLAUSE

OWNER WARRANTS THAT:

A) THE VESSEL IS FULLY FITTED WITH PROPERLY FUNCTIONING MOORING GEAR AND OTHER EQUIPMENT AS SPECIFIED IN THE LATEST EDITION OF THE OCIMF "RECOMMENDATIONS FOR EQUIPMENT EMPLOYED IN THE MOORING OF SHIPS AT SINGLE POINT MOORINGS", AND THAT THE VESSEL WILL MAINTAIN SUCH GEAR AND EQUIPMENT IN PROPER WORKING ORDER WHILE IN SERVICE TO CHARTERER UNDER THIS CHARTER PARTY.

B) THE VESSEL WILL FULLY COMPLY WITH AND FOLLOW THE OPERATIONAL PROCEDURES AS OUTLINED IN THE LATEST EDITION OF THE OCIMF "SINGLE POINT MOORING & OPERATIONS GUIDE", AND WILL FULLY COMPLY WITH AND FOLLOW THE LATEST EDITION OF THE OCIMF/ ICS PUBLICATION "INTERNATIONAL SAFETY GUIDE FOR OIL TANKERS AND TERMINALS".

C) AT ALL TIMES WHILE THE VESSEL IS BERTHED AT A SEA TERMINAL OR SPM, ITS MAIN ENGINES, STEERING MACHINERY AND ITS NECESSARY EQUIPMENT SHALL BE MAINTAINED IN A CONDITION TO ALLOW IMMEDIATE MANEUVERING OF THE VESSEL.

D) THE VESSEL WILL FULLY COMPLY WITH ALL APPLICABLE INTERNATIONAL AND NATIONAL, INCLUDING U.S. COAST GUARD, REQUIREMENTS, REGULATIONS AND PROCEDURES INCLUDING BUT NOT LIMITED TO THE MAINTENANCE OF A QUALIFIED LIVE BRIDGE WATCH AND A BOW WATCH AT ALL TIMES WHILE THE VESSEL IS AT A SEA TERMINAL OR SPM.

CALIFORNIA NAVIGATION

A) WHEN ARRIVING OR DEPARTING THE PORTS OF LOS ANGELES & LONG BEACH, VESSELS SHALL PROCEED AT SPEEDS NOT EXCEEDING 12 KNOTS WHEN INSIDE A 40 NAUTICAL MILE RADIUS OF POINT FERMIN IN ACCORDANCE WITH THE PORTS' GREEN FLAG PROGRAM.

(B) IN ADDITION TO PUBLISHED TANKER EXCLUSION ZONES, VESSELS SHALL:

TRANSIT ALONG THE US WEST COAST BETWEEN SAN DIEGO, CALIFORNIA AND THE STRAITS OF JUAN DE FUCA AT LEAST

50 NAUTICAL MILES OFFSHORE, EXCEPT WHEN MAKING AN APPROACH TO OR DEPARTURE FROM PORT.

C) ARRIVE AND DEPART LOS ANGELES AND LONG BEACH HARBORS, WITH COURSE LINES AS CLOSE AS PRACTICABLE TO A DUE EAST OR WEST HEADING UNTIL 50 NAUTICAL MILES FROM LAND. NOT USE THE SANTA BARBARA CHANNEL.

APPROVAL CONDITIONS

Approved for charter in and to load at PTP Puerto Armuelles Panama and to discharge at Tesoro Golden Eagle Amorco Martinez, and Tesoro Long Beach berth 121 subject to the approval conditions listed below.

This approval is subject to load port PTP Puerto Armuelles Panama approval.

Not Approved for Tesoro Long Beach berths 78, 84A, 86 and Pacific Atlantic (PAT) Martinez as vessel exceeds berths physical limitations.

• All cargo must be loaded, carried, discharged, sampled and gauged in a closed, inerted

condition.

• Vessel must be attended by a Dalian Ocean Marine Superintendent at the all the USWC cargo

discharge operations due to non-compliance of SMS evidenced in the 13 January 2015 and 14 February 2015 SIRE reports.

• Due to KTM the vessel must work closely with San Francisco Pilots to safely transit Carquinez

Bridge.

• Vessel must affirm compliance with MARPOL Annex VI, Appendix VII effective 01 January 2015

pertaining to the control of emissions from the main engine, auxiliary engine(s), and boilers while the vessel is operating in NAECA within 200 nautical miles of the shoreline of U.S. including the Hawaii Islands, with Marine Fuel Oil (LSFO) maximum of 0.1 percent sulfur by weight. If requested, must provide Tesoro with a copy of the signed and stamped proof of compliance.

- When arriving or departing the ports of Los Angeles & Long Beach, vessels shall proceed at

speeds not exceeding 12 knots when inside a 40 nautical mile radius of Point Fermin.

- In addition to published Tanker Exclusion Zones, vessels shall transit along the US West Coast

between San Diego, California and the Straits of Juan De Fuca at least 50 nautical miles offshore of the nearest land, except when making an approach to or departure from port.

- When arriving from or departing to points to the north of Los Angeles, Long Beach harbors and

El Segundo, vessels shall proceed along a course line as close as practicable to due east or due west between Santa Catalina, Santa Barbara, and San Nicolas Islands to the south and Santa Cruz, Santa Rosa and San Miguel Islands to the north, until 50 nautical miles from land.  Vessels shall not transit the Santa Barbara Channel under any circumstances. When arriving from or departing to points to the south of Los Angeles, Long Beach harbors and El Segundo, vessels shall proceed by way of the southbound traffic separation scheme in the Gulf of Santa Catalina east of Santa Catalina and San Clemente Islands.

- Due to the height of the KTM the vessel must work closely with San Francisco Pilots to safely

transit Carquinez Bridge enroute to Tesoro Golden Eagle Amorco Martinez terminal.

END RECAP

DAP/ PHJ

CR WEBER

No Attachment

CLARKSON PLATOU SHIPBROKING

Phone (713) 235-7400 - Fax (713) 235-7449

tankers@houston.clarksons.com

DATE:    JUNE 4, 2015

TO:    TESORO FAR EAST MARITIME COMPANY SA

ATTN:    LISA MCCORD

TO:    HEIDMAR

ATTN:    JOE GARIN

FROM:    CLARKSONs platou SHIPPING SERVICES USA llc

RE:    DA MING HU / TESORO far east maritime co c/p dated june 4, 2015

STRICTLY PRIVATE & CONFIDENTIAL

WE ARE PLEASED TO CONFIRM THE FOLLOWING FOR A/C TESORO FAR EAST MARITIME COMPANY SA with all subjects in order

and lifted:

CHARTERER        : TESORO FAR EAST MARITIME COMPANY OR

        IT'S GUARANTEED NOMINEE

DISPONENT OWNER    : BLUE FIN TANKERS INC.

        20 GLOVER AVENUE,

        NORWALK CT

        USA 06850

        TEL: +1-203-662-2660

        EMAIL: BULLETIN@HEIDMAR.CO

COMMERCIAL OPERATOR : HEIDMAR INC.

        20 GLOVER AVENUE

        NORWALK, CT 06850

        TEL: +1 203 662 2620

        EMAIL: BULLETIN@HEIDMAR.COM

BROKER          : clarkson shipping services usa llc

C/P FORM         : EXXONMOBILVOY 2000

C/P DATED        : JUNE 4, 2015

TESORO VOY #     : DAMI-1501

(A)        VESSEL DESCRIPTION AND POSITION:

VESSEL    : Da Ming Hu

IMO NUMBER:  : 9259721

EX-NAME     : Not Applicable

SDWT       : 159149.00 MT

SDRAFT     : 17.30 m

LOA       : 274.70 m

BEAM     : 48.03 m

FLAG       : China, People's Republic of

BUILT      : Nov 28, 2003

CLASS      : China Classification Society

STOPPERS    : 2  x 200.00 MT - Hinged Bar

CHAIN SIZE  : 76.00 mm

CUBIC 98 PCT : 176177 m3 (ex slops)

SLOP 98 PCT  : 3453.5 m3

TOTAL 98 PCT : 179630.60 m3

SEGREGATIONS : 3

PUMPS      : 3 x 3500 Cu. Metres/Hour (Centrifugal)

TPC/TPI    : 119.00 MT / 297.5 LT

BCM          : 139.30 m

KTM          : 54.44 m

IGS          : Yes

COW          : Yes

SBT/CBT      : SBT

VRS          : Yes

GRT          : 84855.00

NRT          : 52153.00

PCNT         : N/A

SCNT         : 79,866.50

DERRICKS     : 0 x MT

CRANES       : 2 x 15.00 MT

COATED       : MODIFIED EPOXY , Bottom Plating and upto 1mtr from bottom/Slop Wings fully coated

HULL         : Double Hull

CALL SIGN    : BOGG

P AND I      : Assuranceforeningen Skuld (Gjensidig) Hong Kong Branch

QUALIFIED IND: O'BRIENS OIL POLLUTION SERVICE

OSRO         : NATIONAL RESPONSE CORPORATION (NCR)

COC/TVEL     : Jun 07, 2014

ISPS         : Jan 17, 2019

APPROVALS    : TTBOOK VSL APPROVED - **REVERTING**

LAST SIRE    : Mar 18, 2015 / Brisbane

LAST CARGO   : Bitumen Mixture

2ND LAST    : Sokol Crude

3RD LAST    : Qarun Mix Crude

ITINERARY:       05/31     SAILED GALLE

                 06/21 ETA ANGLOA

**(B) LAYDAYS:**       JUNE 21-22, 2015 (0001-1600)

**(C) LOADING RANGE:**    1/2 SAFE PORT(S) ANGOLA

**(D) DISCHARGING RANGE:**  1/2 SAFE PORT(S)USG EX FLA

          OR IN CHOPT

1/2 SAFE PORT(S) CARIBS EX CCOH

          OR IN CHOPT

1/2 SAFE PORT(S)USWC (LA-SF RANGE)

**(E) CARGO QUANTITY:** PC MINIMUM 130,000 METRIC TONS CHARTERER'S OPTION TO FULL CARGO, NO DEADFREIGHT CHARTERER'S ACCOUNT PROVIDED MINIMUM QUANTITY SUPPLIED.

**(F) CARGO DESCRIPTION:** CRUDE OIL - NO HEAT - MAX 3 GRADES WVNS.

**(G) FREIGHT RATE:** WS 82.5 IF USG OR EC PANAMA DISCHARGE

       WS 85.0 IF CARIBS DISCHARGE (OTHER THAN EC PAN)

       WS 92.5 IF USWC DISCHARGE

OVERAGE:  IF ANY AT 50 PERCENT

**(H) FREIGHT PAYABLE TO:** IN USD VIA TELEGRAPHIC TRANSFER TO OWNERS DESIGNATED

    BANK ACCOUNT AS FOLLOWS:

OWNER'S BANK ACCOUNT AS FOLLOWS:

BANK OF NEW YORK

ABA: 021000018 - SWIFT CODE: IRVTUS3N

FOR CREDIT TO DNB NOR BANK ASA,

NEW YORK SWIFT CODE DNBAUS33

ACCT NBR: 19584001 - REF: BLUE FIN TANKERS INC

**(I) LAYTIME:**  72 HOURS

**(J) CP SPEED:** VESSEL TO PERFORM LADEN VOYAGE AT 12.5 KNOTS WSNP

**(K) DEMURRAGE:** USD 40,000 PDPR

**(L) COMMISSION:** 1.25 PCT ADDRESS TO CHARTERERS AND

1.25 PCT TO CLARKSONS SHIPPING SERVICES USA LLC ON FREIGHT, DEADFREIGHT AND DEMURRAGE.

****TERMS AS PER LAST DONE DA YUAN HU / TESORO - CP 05/05/15 + ADDENDUM #1 AS FOLLOWS***

SPECIAL PROVISIONS:

-------------------

1. . OWNER CONTACT INFORMATION:

   MAIN OPERATIONS CONTACT:

   NAME : DARIN RUPINSKI

   OFFICE TELEPHONE NUMBER : 1-203-662-2660 (24 HRS)

   OFFICE FAX NUMBER : 1-203-662-2783

   E-MAIL : BULLETIN@HEIDMAR.COM

   DIRECT: 1-203-662-2664

   MOBILE NUMBER : 1-203-434-4119

   PVT EMAIL: Darin.Rupinski@heidmar.com

2. OWNER WARRANTS VESSEL TO ARRIVE AT LOADPORT WITH LESS THAN 5 PPM H2S IN ALL CARGO TANKS

3. NORTH AMERICAN ECA CLAUSE: NA ECA AS PER WS 2015.

CHARTERER TO PAY THE WORLDSCALE SPECIFIED DIFFERENTIAL (USD/ MILE) OF THE ACTUAL VOYAGE (LADEN CONDITION ONLY) BASED ON THE GREATER OF CHARTERER'S OR CUSTOMARY ROUTING AND SUPPORTED BY MASTER'S STATEMENT. NA ECA IS PAYABLE ON THE SAME TERMS AS FREIGHT BUT BY SEPARATE INVOICE.

4. WSHTC

ADDITIONAL CLAUSES -

ANY TAXES A/O DUES ON FREIGHT A/O CARGO INCL THOSE MENTIONED IN WS AS BEING FOR CHARTS ACCOUNT ALL TO BE FOR CHARTS ACCOUNT AND SETTLED DIRECTLY BY THEM

ANY STS COSTS (SUBJECT BUT NOT LIMITED TO PORT COSTS, AGENCY COSTS, STS EQUIP COSTS, TOWAGE) TO BE FOR CHARTS ACCT AND SETTLED BY THEM DIRECTLY

HEIDMAR WEATHER CLAUSE

IF VESSEL LOADS AND/OR DISCHARGES AT ANY OFFSHORE MOORING, BARGE-TO-SHIP/ SHIP-TO-SHIP TRANSFER/LIGHTERING, SEA BERTH/SEA LINE OR BERTH EXPOSED TO ADVERSE WEATHER OR SEA CONDITIONS, ANY DELAYS DUE TO BAD WEATHER AND/OR SEASWELL, FOG OR ANY OTHER PREVAILING CONDITIONS IS TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF VSL IS ON DEMURRAGE. SHOULD THE MASTER, PILOT OR ANY LOCAL AUTHORITY DEEM IT NECCESSARY TO HAVE TUGS STANDING-BY, SHIFT/UNBERTH/REBERTH THE VESSEL, OR REQUIRE ANY OTHER ADDITIONAL EQUIPMENT OR SERVICES TO MAINTAIN THE SAFETY OF THE VESSEL AND/OR MOORING EQUIPMENT, THEN ANY AND ALL SUCH ADDITIONAL EXPENSES INCURRED TO BE FOR CHRTRS ACCT AND SETTLED DIRECTLY BY THEM

-FACILITATION PAYMENTS AND ANTI-CORRUPTION - FOR THIS CP ONLY

OWNERS AND CHARTERERS (EITHER DIRECTLY OR THROUGH ANY OF THEIR AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, MASTERS, CREWMEMBERS, AGENTS, MANAGERS, REPRESENTATIVES OR PARTIES ACTING FOR OR ON BEHALF OF THEM OR THEIR AFFILIATES):

(A) WILL COMPLY WITH ALL APPLICABLE LAWS, RULES, DECREES, REGULATIONS, ORDERS AND THE LIKE, INCLUDING BUT NOT LIMITED TO, THE UNITED STATE OF AMERICA FOREIGN CORRUPT PRACTICES ACT OF 1977, AS AMENDED AND THE UNITED KINGDOM BRIBERY ACT OF 2010, AS AMENDED, OR ANY OTHER APPLICABLE JURISDICTION RELATING TO ANTI-BRIBERY, ANTI-CORRUPTION, ANTI-TERRORISM AND ANTI-MONEY LAUNDERING (APPLICABLE PROHIBITIONS);

(B) REPRESENT AND WARRANT THAT THEY WILL NOT DIRECTLY, INDIRECTLY OR THROUGH ANY OTHER PERSON OR ENTITY (1) PAY, OFFER, GIVE, PROMISE, OR AUTHORIZE MONIES, BENEFIT OR ANYTHING OF VALUE TO I) AN OFFICIAL, OFFICER, EMPLOYEE OR AGENT, OF A GOVERNMENT OR ANY DEPARTMENT, AGENCY OR INSTRUMENTALITY OF ANY GOVERNMENT OR ANY GOVERNMENT-OWNED BUSINESS; II) AN OFFICER, EMPLOYEE OR AGENT OF AN INTERNATIONAL ORGANIZATION; III) ANY PERSON OR ENTITY ACTING FOR OR ON BEHALF OF ANY GOVERNMENT OR DEPARTMENT, AGENCY, OR INSTRUMENTALITY OF SUCH GOVERNMENT, GOVERNMENT-OWNED BUSINESS OR OF ANY INTERNATIONAL ORGANIZATION; IV) ANY POLITICAL PARTY OR OFFICER THEREOF, OR ANY CANDIDATE FOR POLITICAL OFFICE; V) ANY OTHER PERSON, INDIVIDUAL, ENTITY AT THE SUGGESTION, REQUEST OR DIRECTION OF OR FOR THE BENEFIT OF, OR ANY CLOSE FAMILY MEMBER OF, ANY OF THE ABOVE-DESCRIBED PERSONS OR ENTITIES; VI) ANY PERSON HOLDING A LEGISLATIVE, ADMINISTRATIVE OR JUDICIAL OFFICE, WHETHER APPOINTED OR ELECTED, OR (2) ENGAGE IN ANY OTHER ACTS OR TRANSACTIONS, IN EACH CASE IF IT IS IN VIOLATION OF OR INCONSISTENT WITH THE APPLICABLE PROHIBITIONS OF ANY RELEVANT JURISDICTION;


(C) MAINTAIN AND ENFORCE ITS OWN POLICIES AND PROCEDURES TO ENSURE COMPLIANCE WITH THIS CLAUSE;


(D) IF REQUESTED BY TESORO, ANNUALLY CERTIFY COMPLIANCE WITH THIS CLAUSE AND THE APPLICABLE PROHIBITIONS; AND


(E) PROMPTLY NOTIFY TESORO OF ANY NOTICE, VIOLATION, FINE OR PENALTY INVOLVING THE APPLICABLE PROHIBITIONS.


ANY VIOLATION OF THE APPLICABLE PROHIBITIONS BY OWNER OR CHARTERER WILL DEEMED TO BE A BREACH OF A MATERIAL COVENANT OF THE AGREEMENT, IF TESORO


LEARNS OF OR HAS A GOOD FAITH BELIEF THAT OWNER OR CHARTERER OR ANY SUBSIDIARY OR OTHER AFFILIATED ENTITY HAS VIOLATED OR CAUSED TESORO TO VIOLATE ANY OF THE APPLICABLE PROVISIONS, TESORO MAY TERMINATE THIS AGREEMENT NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY. IN THE EVENT OF SUCH TERMINATION, TESORO WILL BE RELIEVED OF ALL LIABILITY AND OBLIGATIONS OF ANY KIND HEREUNDER, INCLUDING ANY LIABILITY TO MAKE PAYMENTS UNDER THIS AGREEMENT


CHARTER PARTY FORM: EXXONMOBIL VOY 2000, TERMS AND CONDITIONS TO APPLY WITH FOLLOWING AMENDMENTS/ADDITIONS:


EXXONMOBIL VOY 2000 PART II


-----------------------


CLS 1 - (D) LINE 10 DELETE "WITH GANGWAY DOWN"


CLS 3 - (B) DELETE

CLS 13 - (C) DELETE AFTER "EFFECTED" FROM LINE 174 TO 176 AND ADD "PROVIDED ALWAYS THAT IF THE VESSEL IS DETAINED SOLELY FOR THE PURPOSES OF AWAITING CARGO DOCUMENTS AT LOADPORT FOR MORE THAN THREE(3) HOURS BEYOND THE FINAL DISCONNECTION OF CARGO HOSES, LAYTIME OF IF THE VESSEL IS ON DEMURRAGE, DEMURRAGE SHALL RECOMMENCE AFTER SUCH PERIOD OF THREE(3) HOURS AND TERMINATE UPON THE COMPLETION OF CARGO DOCUMENTATION. IF, AFTER COMPLETION OF LOADING OR DISCHARGING,THE VESSEL IS REQUIRED TO PROCEED TO AN ANCHORAGE FOR CHARTERERS' PURPOSES, THEN THE TIME SPEND MOVING FROM THE BERTH TO THE ANCHORAGE SHALL NOT COUNT AS PART OF THE THREE(3) HOURS REFERRED TO ABOVE OR AS LAYTIME, IF THE VESSEL IS ON DEMURRAGE, AS DEMURRAGE."

CLS 14 - (C) ADD AT END: IF BUNKERING DOES NOT INTERFER WITH BERTHING THEN TIME BUNKERING TO COUNT AS LAYTIME OR IF ON DEMURRAGE, DEMURRAGE.

CLS 18 - (D) LINE 336, AFTER "VESSEL", INSERT "BEFORE LOADING OR", AFTER "PIPELINES" INSERT "OR FLOATING HOSES"

AFTER "WATER", INSERT "OR CPP SUPPLIED BY TERMINAL"

LINE 337, ADD AT THE END," OWNER SHALL NOT BE HELD RESPONSIBLE FOR THE DISCOLORATION OR ANY OTHER CONSEQUENCES RELATED TO THIS PARTICULAR OPERATION".

CLS 18 - (F) LINE 340 INSERT "HOMOGENIOUS" AFTER ENTIRE, DELETE "BE IT ONE OR MORE GRADES"

LINE 340 INSERT 'AVERAGE' AFTER 'MAINTAIN'

LINE 341 AFTER "DISCHARGE" ADD "EXCLUDING STRIPPING (MAX STRIPPING 3 HOURS)"

CLS 18 - (H) LINE 360, AFTER "DETERMINED BY" DELETE "MUTUALLY AGREEABLE" AND ADD "THE RECEIVER'S CURRENTLY EMPLOYED INDEPENDENT INSPECTOR"

CLS 25 - LINE 418, AFTER "NEXT TAKEN" ADD "IF THE CARGO FOR THE RESPECTIVE CHARTER PARTY IS A NO HEAT CARGO AS DESCRIBED IN PART I(F) OF EXXONMOBILVOY 2000, THE CHARTERER SHALL HAVE THE OPTION TO INCREASE THE CARGO TEMPERATURE UPTO 110 DEGS FAHRENHEIT FOR DISCHARGE. CHARTERERS SHALL PAY FOR THE ADDITIONAL BUNKERS CONSUMED SOLELY DUE TO THE INCREASE IN TEMPERATURE AS AFORESAID.

THE PRICING FOR THE ADDITIONAL BUNKERS SHALL BE AT THE OWNER'S DOCUMENTED LAST TAKEN ACTUAL COST FOR SUCH BUNKERS AT THE PORT WHERE BUNKERS ARE LAST TAKEN" CHARTS TO INCLUDE HEATING INSTRUCTIONS IN VOYAGE ORDERS.

CLS 26 - DELETE

CLS 27 - (C) DELETE ALL FROM LINES 480 TO LINE 490.

CLS 33 - DELETE (A),

INSERT IN PLACE OF (A) 'OWNER TO COMPLY WITH LATEST IMO AND PORT STATE REGULATIONS'

CLS 36 - LINE 658, AFTER '90 DAYS' INSERT '90 DAYS FOR DEMURRAGE, 120 DAYS FOR ALL OTHER CLAIMS'

THE FOLLOWING TESORO FAR EAST MARITIME COMPANY CLAUSES AS WRITTEN OCTOBER 2004 (EFFECTIVE 1 NOVEMBER

2004) ARE HEREBY INCORPORATED INTO THIS CHARTER PARTY, AS AMENDED:

1. PRIVACY - OK

2. ADDITIONAL CARGO INSURANCE - N/A FOR THIS VOYAGE

3. ADDRESS COMMISSION - OK

4. SEA TERMINAL/SPM MOORING CLAUSE - OK

6. VOYAGE ORDERS ADD "AND CHARTERERS ISSUED VOYAGE ORDERS MUST ALWAYS BE IN COMPLIANCE WITH ALL TERMS IN REFERENCED RECAP AND/OR CHARTER PARTY"

7. IN TRANSIT LOSS PARA. 1 - DELETE '0.3', INSERT '0.5'.

PARA. 2 - DELETE LAST SENTENCE "CARGO QUANTITIES....SHALL BE CONCLUSIVE".

8. BUNKER CLAUSE DELETE PARA 2. (B) PARA 3. (C) AFTER "AS LAYTIME" INSERT "SHOULD THE SAID OPERATION DELAY VESSEL"

9. CARBON BLACK CLEANING CLAUSE DELETE - OK

10. DEMURRAGE/EXPENSE LINE 3, AFTER "BUT NOT LIMITED" DELETE "TO ETA NOTICES...

11. SAMPLE AND SURVEY - OK

12. ITF - DELETE ENTIRE CLAUSE AND INSERT "VESSEL IS ITF OR EQUIVELENT"

13. CARGO TRANSFER - OK

14. U.S. CUSTOMS COMPLIANCE/AMS DELETE / INSERT: U.S. CUSTOMS COMPLIANCE/AMS OWNER WARRANTS THAT IT IS IN COMPLIANCE WITH THE CURRENT US CUSTOMS REGULATIONS (19 CFR 4.7) OR ANY SUBSEQUENT AMENDMENTS THERETO AND SHALL UNDERTAKE THE ROLE OF CARRIER FOR THE PURPOSES OF SUCH REGULATIONS AND SHALL, IN THEIR OWN NAME, TIME AND EXPENSE:

I) POSSESS A SCAC (STANDARD CARRIER ALPHA CODE);

III) SUBMIT A CARGO DECLARATION BY AMS (AUTOMATED MANIFEST SYSTEM) TO THE US CUSTOMS.

CHARTERER SHALL PROVIDE ALL NECESSARY INFORMATION TO THE OWNERS AND/OR THEIR AGENTS TO ENABLE THE OWNERS TO SUBMIT A TIMELY AND ACCURATE CARGO DECLARATION.

CHARTERER SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OWNERS AGAINST ANY LOSS AND/OR DAMAGE WHATSOEVER AND/OR ANY EXPENSES, FINES, PENALTIES AND ALL OTHER CLAIMS OF WHATSOEVER NATURE, INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE CHARTERER'S FAILURE TO COMPLY WITH ANY OF THE PROVISIONS OF THIS SUB-CLAUSE. SHOULD SUCH FAILURE RESULT IN ANY DELAY THEN, NOTWITHSTANDING ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY, ALL TIME USED OR LOST SHALL COUNT AS LAYTIME OR, IF THE VESSEL IS ALREADY ON DEMURRAGE, TIME ON DEMURRAGE.

OWNERS SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE CHARTERER AGAINST ANY LOSS AND/OR DAMAGE WHATSOEVER (INCLUDING CONSEQUENTIAL LOSS AND/OR DAMAGE) AND ANY EXPENSES, FINES, PENALTIES AND ALL OTHER CLAIMS OF WHATSOEVER NATURE, INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE OWNERS' FAILURE TO COMPLY WITH ANY OF THE PROVISIONS OF SUB-CLAUSE (A). SHOULD SUCH FAILURE RESULT IN ANY DELAY THEN, NOTWITHSTANDING ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY, ALL TIME USED OR LOST SHALL NOT COUNT AS LAYTIME OR, IF THE VESSEL IS ALREADY ON DEMURRAGE, TIME ON DEMURRAGE.

THE ASSUMPTION OF THE ROLE OF CARRIER BY THE OWNERS PURSUANT TO THIS CLAUSE AND FOR THE PURPOSE OF THE US CUSTOMS REGULATIONS (19 CFR 4.7) SHALL BE WITHOUT PREJUDICE TO THE IDENTITY OF CARRIER UNDER ANY BILL OF LADING, OTHER CONTRACT, LAW OR REGULATION.

IF REQUESTED BY CHARTERER, OWNER TO PROVIDE A COPY OF THEIR INTERNATIONAL CARRIER BOND FORM WITHIN 5 WORKING DAYS AFTER THE VESSEL IS FIXED OR 5 DAYS BEFORE ARRIVAL DISCHARGE PORT WHICHEVER IS EARLIER. IF OWNERS ARE UNABLE TO COMPLY IN A TIMELY MANNER, CHARTERER'S WILL INFORM OWNER AND PROCEED TO INSTRUCT DESIGNATED 3RD PARTIES TO ARRANGE AND FILE ON OWNERS BEHALF. COST AND TIME, INCLUDING ANY DELAYS ASSOCIATED WITH THESE REQUIREMENTS, WILL BE FOR OWNERS ACCOUNT AND TO BE SETTLED DIRECTLY BY THEM.

THIS ACTION DOES NOT RELIEVE THE OWNER OF THEIR OBLIGATION UNDER THIS CLAUSE.

OWNERS WILL ADVISE BOND NUMBER/EXPIRY DATE.

15. FPSO CLAUSE - DELETE, N/A THIS VOYAGE

16. NOTICES - OK

17. OCEANROUTES - DELETE

18. BIMCO STANDARD ISM CLAUSE - OK

19. ALASKA CLAUSE - DELETE

20. HYDROGEN SULPHIDE (H2S) - LAST PARA. DELETE "A REASONABLE TIME" AND INSERT "A PERIOD EQUAL TO AGREED LAYTIME"

21. PART CARGO (DEMURRAGE) - DELETE

22. CLEARANCE - ADD AT END "HOWEVER, WHERE THE VESSEL IS INSTRUCTED TO WAIT AT ANCHORAGE, AND IT IS NOT CUSTOMARY TO GRANT PORT CLEARANCE AT ANCHORAGE, THIS CLAUSE WILL NOT APPLY UNTIL SUCH TIME AS CLEARANCE IS CUSTOMARILY GIVEN/REJECTED."

23. SPEED - 1ST PARA. ONLY, INSERT "12.5 KTS WSNP"

24. ADDITIONAL LOAD/DISCHARGE PORT(S) - DELETE N/A

25. JAPAN CLAUSE - DELETE

26. KOREA CLAUSE - DELETE

27. CHARTER PARTY ADMINISTRATIVE CLAUSE - OK

28. QUESTIONNAIRE(S) - OK

29. ISPS CLAUSE FOR VOYAGE CHARTER PARTIES - OK

30. CERTIFICATE OF COMPLIANCE (COC) -OK

SEA TERMINAL / SPM MOORING CLAUSE

OWNER WARRANTS THAT:

A) THE VESSEL IS FULLY FITTED WITH PROPERLY FUNCTIONING MOORING GEAR AND OTHER EQUIPMENT AS SPECIFIED IN THE LATEST EDITION OF THE OCIMF "RECOMMENDATIONS FOR EQUIPMENT EMPLOYED IN THE MOORING OF SHIPS AT SINGLE POINT MOORINGS", AND THAT THE VESSEL WILL MAINTAIN SUCH GEAR AND EQUIPMENT IN PROPER WORKING ORDER WHILE IN SERVICE TO CHARTERER UNDER THIS CHARTER PARTY.

B) THE VESSEL WILL FULLY COMPLY WITH AND FOLLOW THE OPERATIONAL PROCEDURES AS OUTLINED IN THE LATEST EDITION OF THE OCIMF "SINGLE POINT MOORING & OPERATIONS GUIDE", AND WILL FULLY COMPLY WITH AND FOLLOW THE LATEST EDITION OF THE OCIMF/ ICS PUBLICATION "INTERNATIONAL SAFETY GUIDE FOR OIL TANKERS AND TERMINALS".

C) AT ALL TIMES WHILE THE VESSEL IS BERTHED AT A SEA TERMINAL OR SPM, ITS MAIN ENGINES, STEERING MACHINERY AND ITS NECESSARY EQUIPMENT SHALL BE MAINTAINED IN A CONDITION TO ALLOW IMMEDIATE MANEUVERING OF THE VESSEL.

D) THE VESSEL WILL FULLY COMPLY WITH ALL APPLICABLE INTERNATIONAL AND NATIONAL, INCLUDING U.S. COAST GUARD, REQUIREMENTS, REGULATIONS AND PROCEDURES INCLUDING BUT NOT LIMITED TO THE MAINTENANCE OF A QUALIFIED LIVE BRIDGE WATCH AND A BOW WATCH AT ALL TIMES WHILE THE VESSEL IS AT A SEA TERMINAL OR SPM.

CALIFORNIA NAVIGATION

A) WHEN ARRIVING OR DEPARTING THE PORTS OF LOS ANGELES & LONG BEACH, VESSELS SHALL PROCEED AT SPEEDS NOT EXCEEDING 12 KNOTS WHEN INSIDE A 40 NAUTICAL MILE RADIUS OF POINT FERMIN IN ACCORDANCE WITH THE PORTS' GREEN FLAG PROGRAM.

(B) IN ADDITION TO PUBLISHED TANKER EXCLUSION ZONES, VESSELS SHALL:

TRANSIT ALONG THE US WEST COAST BETWEEN SAN DIEGO, CALIFORNIA AND THE STRAITS OF JUAN DE FUCA AT LEAST

50 NAUTICAL MILES OFFSHORE, EXCEPT WHEN MAKING AN APPROACH TO OR DEPARTURE FROM PORT.

C) ARRIVE AND DEPART LOS ANGELES AND LONG BEACH HARBORS, WITH COURSE LINES AS CLOSE AS PRACTICABLE TO A DUE EAST OR WEST HEADING UNTIL 50 NAUTICAL MILES FROM LAND. NOT USE THE SANTA BARBARA CHANNEL.

APPROVAL CONDITIONS -

All cargo must be loaded, carried, discharged, sampled and gauged in a closed, inerted condition. – Confirmed

Vessel shall not transit the Magellan Straits. - FOR THIS VOYAGE ONLY – Confirmed

Vessel must arrive load berth with the vapor space in all cargo tanks measured at less than 5 ppm H2S and provide documentation to vetting@tsocorp.com<mailto:vetting@tsocorp.com> - Confirmed

Vessel must arrive PTP Chiriqui Grande with the vapor space in all cargo/slop tanks measured at less than 100ppm H2S and provide documentation to vetting@tsocorp.com<mailto:vetting@tsocorp.com> - Confirmed

Vessel must provide the Capacity Plan of a higher quality to vetting@tsocorp.com<mailto:vetting@tsocorp.com> - Confirmed. Please find Capacity Plan attached.

USA & CALIFORNIA SPECIFIC CONDITIONS:

Vessel must affirm compliance with MARPOL Annex VI, Appendix VII effective 01 January 15 pertaining to the control of emissions from the main engine, auxiliary engine(s), and boilers while the vessel is operating in NA-ECA within 200 nautical miles of the shoreline of U.S. including the Hawaii Islands and Canada

with Marine Fuel Oil maximum of 0.1 percent sulfur by weight. If requested, must provide Tesoro with a copy of the signed and stamped proof of compliance.- Confirmed

In addition to published Tanker Exclusion Zones, vessels shall transit along the US West Coast between San Diego, California and the Straits of Juan De Fuca at least 50 nautical miles offshore of the nearest land, except when making an approach to or departure from port. – Confirmed

Vessel must have a valid USCG/COC with annual verification endorsement prior to calling at Tesoro and must provide a copy in advance. - Please find USCG COC attached.

When arriving or departing the ports of Los Angeles & Long Beach, vessels shall proceed at speeds not exceeding 12 knots when inside a 40 nautical mile radius of Point Fermin. – confirmed

When arriving from or departing to points to the north of Los Angeles, Long Beach harbors and El Segundo, vessels shall proceed along a course line as close as practicable to due east or due west between Santa Catalina, Santa Barbara, and San Nicolas Islands to the south and Santa Cruz, Santa Rosa and San Miguel Islands to the north, until 50 nautical miles from land.  Vessels shall not transit the Santa Barbara Channel under any circumstances.  When arriving from or departing to points to the south of Los Angeles, Long Beach harbors and El Segundo, vessels shall proceed by way of the southbound traffic separation scheme in the Gulf of Santa Catalina east of Santa Catalina and San Clemente Islands. - Confirmed

-------------------------------------------------------------------

  (BROKERS DETAILS)

NAME      : CLARKSON SHIPPING SERVICES USA LLC

ADDRESS    : 1333 WEST LOOP SOUTH, HOUSTON TEXAS 77057

EMAIL      : TANKERS@HOUSTON.CLARKSONS.COM

OPERATIONS  : MR. SEAN TAMMARO

OFFICE     : 713.235.7400

MOBILE     : 832.859.3703

EMAIL     : OPERATIONS@HOUSTON.CLARKSONS.COM

** ALL CLAIMS TO BE SENT TO CLAIMS@HOUSTON.CLARKSONS.COM

---------------------------------------------------------------

1.25 PCT ADDRESS COMMISSION ON FRT/DFRT/DEM

1.25 PCT TO CLARKSON SHIPPING SERVICES USA LLC AND ON FRT/DFRT/DEM

PLS CONFIRM PROMPTLY THAT THE ABOVE IS IN ACCORDANCE WITH YOUR NOTES

END RECAP

MANY THANKS FOR YOUR SUPPORT!

BEST REGARDS,

CLARKSON SHIPPING SERVICES USA LLC

---

This message is private and confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply email and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person: to do so could be a breach of confidence.

Emails may be monitored.

Details of Clarkson group companies and their regulators (where applicable) can be found at this url: Disclosure

---

No Attachment

TO:   TESORO FAR EAST MARITIME COMPANY SA

ATTN: DAMIAN CANDELET


TO:   HEIDMAR

ATT:  JOE GARIN


REF: DA YUAN HU / TESORO - C/P DATED 6/9/15


- STRICTLY  P+C -


- FINAL RECAP -


AS PER YOUR AUTHORIT WE ARE PLEASED TO CONFIRM THE FOLLOWING FIXTURE FOR

ACCOUNT TESORO MARITIME COMPANY ON THE BELOW TERMS AND CONDITIONS. ALL

SUBJECTS HAVING BEEN LIFTED.


CHARTERER          : TESORO FAR EAST MARITIME COMPANY OR

                     IT'S GUARANTEED NOMINEES

                     19100 RIDGEWOOD PARKWAY

SAN ANTONIO, TX 78259

DISPONENT OWNER        : BLUE FIN TANKERS INC.

                         20 GLOVER AVENUE,

                         NORWALK CT

                         USA 06850

                         TEL: +1-203-662-2660

                         EMAIL: BULLETIN@HEIDMAR.CO


COMMERCIAL OPERATOR : HEIDMAR INC.

                         20 GLOVER AVENUE

                         NORWALK, CT 06850

                         TEL: +1 203 662 2620

                         EMAIL: BULLETIN@HEIDMAR.COM


BROKER                 : SSY TANKERS NEW YORK,LLC.

                         1363-2 VETERANS MEMORIAL HIGHWAY

                         HAUPPAUGE, NEW YORK,11788.


C/P FORM               : EXXONMOBILVOY 2000

C/P DATED           : JUNE 9TH,2015.


TESORO VOY #        : DAYU – 1502










====================

VESSEL DESCRIPTION:

====================



VESSEL          : DA YUAN HU

IMO NUMBER:      : 9259733

EX-NAME          : NOT APPLICABLE

SDWT            : 159,149 MT

SDRAFT          : 17.30 M

LOA             : 274.70 M

```
BEAM                 : 48.034 M

FLAG                 : CHINA

BUILT                : JUNE 20, 2004

CLASS                : CHINA CLASSIFICATION SOCIETY

STOPPERS             : 2  X 200 MT - TONGUE TYPE

CHAIN SIZE           : 76 MM

CUBIC 98 PCT         : 176,325.826 M3

SLOP 98 PCT          : 3451.266 M3

SEGREGATIONS         : 3

PUMPS                : 3 X 3500 CU. METRES/HOUR (CENTRIFUGAL)

TPC                  : 119 MT

BCM                  : 139.30 M

KTM                  : 54.44 M

IGS                  : YES

COW                  : YES

SBT/CBT              : SBT

VRS                  : YES

GRT                  : 84855

NRT                  : 52153

PCNT                 : N/A

SCNT                 : 79866.50
```

```
DERRICKS/CRANES     : 2 x 15 TONNES, PORT & STARBOARD


COATED              : MODIFIED EPOXY


HULL                : DOUBLE HULL


CALL SIGN           : BOGH


P AND I             : STEAMSHIP MUTUAL


QUALIFIED IND       : OBRIEN OIL POLLUTION SERVICES


OSRO                : NATIONAL RESPONSE CORPORATION


COC/TVEL            : SEPT 20, 2016


ISSC                : JUN 10, 2019


APPROVALS           : TTBOOK VSL APPROVED BY SHELL/ CEPSA/ P66/ IMT/ KOCH/ REPSOL/

                      CHEVRON


LAST SIRE           : FEB 14 2015 / HUELVA, SPAIN



LAST CARGO          : NO HEAT CRUDE / TESORO / PTP - LA AND SAN FRANCISCO

2ND LAST            : LULU CRUDE / ENAP / LA PALOMA - SAN VICENTE

3RD LAST            : BONNY CRUDE / VITOL / OFFSHORE LOME - JOSE IGNACIO




TOTAL INSURED VALUE : USD 41.0 MILLION



ITINERARY           : VESSEL FREE OF CARGO, DRIFTING OFFSHORE WC MEX.  WILL PROCEED

                      AFTER SUBJECTS ARE LIFTED.

                      ETA PTP 21ST PM (WILL SLOW STEAM AND TIME ARRIVAL PRIOR TO LAYCAN)
```



(B) LAYDAYS           : JUNE 22ND (0001-2359 HRS),2015.

(C) LOADING RANGE    : ONE SAFE PORT PUERTO ARMUELLES.

(D) DISCHARGE RANGE  : ONE/THREE SAFE PORTS USWC (LA – ANACORTES RANGE), INCLUDING PAL.
                       ALWAYS IN GEOGRAPHICAL ROTATION.

(E) CARGO QUANTITY   : PC MINIMUM 130,000 METRIC TONS CHARTERER'S OPTION TO FULL CARGO,
                       NO DEADFREIGHT CHARTERER'S ACCOUNT PROVIDED MINIMUM QUANTITY
                       SUPPLIED.

(F) CARGO DESCRIPTION: CRUDE OIL – NO HEAT – MAX 3 GRADES WVNS.

(G) FREIGHT RATE     : WS 115

OVERAGE              : IF ANY AT 50 PERCENT

(H) FREIGHT PAYABLE TO: IN USD VIA TELEGRAPHIC TRANSFER TO OWNERS

DESIGNATED BANK ACCOUNT AS FOLLOWS:

OWNER'S BANK ACCOUNT AS FOLLOWS:

BANK OF NEW YORK

ABA: 021000018 - SWIFT CODE: IRVTUS3N

FOR CREDIT TO DNB NOR BANK ASA,

NEW YORK SWIFT CODE DNBAUS33

ACCT NBR: 19584001 - REF: BLUE FIN TANKERS INC.

(I) LAYTIME          : 72 HOURS

(J) C/P SPEED        : VESSEL TO PERFORM LADEN VOYAGE AT 12.5 KNOTS WSNP

(K) DEMURRAGE        : USD 45,000 PDPR

(L) COMMISSION       : 1.25 PCT ADDRESS TO CHARTERERS AND

                       1.25 PCT TO SSY TANKERS NEW YORK,LLC. ON

                       FREIGHT, DEADFREIGHT AND DEMURRAGE.

****TERMS AS PER LAST DONE DA LI HU / TESORO - CP 4/1/14 AS FOLLOWS***

SPECIAL PROVISIONS:

1. . OWNER CONTACT INFORMATION:

    MAIN OPERATIONS CONTACT:

    NAME : DARIN RUPINSKI

    OFFICE TELEPHONE NUMBER : 1-203-662-2660 (24 HRS)

    OFFICE FAX NUMBER : 1-203-662-2783

    E-MAIL : BULLETIN@HEIDMAR.COM

    DIRECT: 1-203-662-2664

    MOBILE NUMBER : 1-203-434-4119

    PVT EMAIL: DARIN.RUPINSKI@HEIDMAR.COM


2. OWNER WARRANTS VESSEL TO ARRIVE AT LOADPORT WITH LESS THAN 5 PPM H2S IN
ALL CARGO TANKS.


3. NORTH AMERICAN ECA CLAUSE: NA ECA AS PER WS 2015.

CHARTERER TO PAY THE WORLDSCALE SPECIFIED DIFFERENTIAL (USD/ MILE) OF THE ACTUAL VOYAGE

(LADEN CONDITION ONLY) BASED ON THE GREATER OF CHARTERER'S OR CUSTOMARY ROUTING AND

SUPPORTED BY MASTER'S STATEMENT. NA ECA IS PAYABLE ON THE SAME TERMS AS FREIGHT BUT

BY SEPARATE INVOICE.


4. WSHTC

ANY TAXES A/O DUES ON FREIGHT A/O CARGO INCL THOSE MENTIONED IN WS AS BEING FOR CHARTS ACCOUNT ALL TO BE FOR CHARTS ACCOUNT AND SETTLED DIRECTLY BY THEM

ANY STS COSTS (SUBJECT BUT NOT LIMITED TO PORT COSTS, AGENCY COSTS, STS EQUIP COSTS, TOWAGE) TO BE FOR CHARTS ACCT AND SETTLED BY THEM DIRECTLY.

HEIDMAR WEATHER CLAUSE

IF VESSEL LOADS AND/OR DISCHARGES AT ANY OFFSHORE MOORING, BARGE-TO-SHIP/ SHIP-TO-SHIP TRANSFER/LIGHTERING,SEA BERTH/SEA LINE OR BERTH EXPOSED TO ADVERSE WEATHER OR SEA CONDITIONS,ANY DELAYS DUE TO BAD WEATHER AND/OR SEASWELL, FOG OR ANY OTHER PREVAILING CONDITIONS IS TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF VSL IS ON DEMURRAGE. SHOULD THE MASTER, PILOT OR ANY LOCAL AUTHORITY DEEM IT NECCESSARY TO HAVE TUGS STANDING-BY, SHIFT/UNBERTH/REBERTH THE VESSEL, OR REQUIRE ANY OTHER ADDITIONAL EQUIPMENT OR SERVICES TO MAINTAIN THE SAFETY OF THE VESSEL AND/OR MOORING EQUIPMENT, THEN ANY AND ALL SUCH ADDITIONAL EXPENSES INCURRED TO BE FOR CHRTRS ACCT AND SETTLED DIRECTLY BY THEM.

FACILITATION PAYMENTS AND ANTI-CORRUPTION - FOR THIS CP ONLY

OWNERS AND CHARTERERS (EITHER DIRECTLY OR THROUGH ANY OF THEIR AFFILIATES, DIRECTORS, OFFICERS,EMPLOYEES, MASTERS, CREWMEMBERS, AGENTS, MANAGERS, REPRESENTATIVES OR PARTIES ACTING FOR OR ON BEHALF OF THEM OR THEIR AFFILIATES):

(A)   WILL COMPLY WITH ALL APPLICABLE LAWS, RULES, DECREES,  REGULATIONS, ORDERS AND THE LIKE, INCLUDING BUT NOT LIMITED TO, THE UNITED STATE OF AMERICA FOREIGN CORRUPT PRACTICES ACT OF 1977, AS AMENDED AND THE UNITED KINGDOM BRIBERY ACT OF 2010, AS AMENDED, OR ANY OTHER APPLICABLE  JURISDICTION RELATING TO ANTI-BRIBERY, ANTI-CORRUPTION, ANTI-TERRORISM AND ANTI-MONEY LAUNDERING (APPLICABLE PROHIBITIONS);

(B) REPRESENT AND WARRANT THAT THEY WILL NOT DIRECTLY, INDIRECTLY OR THROUGH ANY OTHER PERSON OR ENTITY (1) PAY, OFFER, GIVE, PROMISE, OR AUTHORIZE MONIES, BENEFIT OR ANYTHING OF VALUE TO I) AN OFFICIAL, OFFICER, EMPLOYEE OR AGENT, OF A GOVERNMENT OR ANY DEPARTMENT,AGENCY OR INSTRUMENTALITY OF ANY GOVERNMENT OR ANY GOVERNMENT-OWNED BUSINESS; II) AN OFFICER,EMPLOYEE OR AGENT OF AN INTERNATIONAL ORGANIZATION; III) ANY PERSON OR ENTITY ACTING FOR OR ON BEHALF OF ANY GOVERNMENT OR DEPARTMENT, AGENCY, OR INSTRUMENTALITY OF SUCH GOVERNMENT, GOVERNMENT-OWNED BUSINESS OR OF ANY INTERNATIONAL ORGANIZATION; IV) ANY POLITICAL PARTY OR OFFICER THEREOF, OR ANY CANDIDATE FOR POLITICAL OFFICE; V) ANY OTHER PERSON, INDIVIDUAL, ENTITY AT THE

SUGGESTION, REQUEST OR DIRECTION OF OR FOR THE BENEFIT OF, OR ANY CLOSE FAMILY MEMBER OF, ANY OF THE ABOVE-DESCRIBED PERSONS OR ENTITIES;

VI) ANY PERSON HOLDING A LEGISLATIVE, ADMINISTRATIVE OR JUDICIAL OFFICE, WHETHER APPOINTED OR ELECTED, OR (2) ENGAGE IN ANY OTHER ACTS OR TRANSACTIONS, IN EACH CASE IF IT IS IN VIOLATION OF OR INCONSISTENT WITH THE APPLICABLE PROHIBITIONS OF ANY RELEVANT JURISDICTION;

(C) MAINTAIN AND ENFORCE ITS OWN POLICIES AND PROCEDURES TO ENSURE COMPLIANCE WITH THIS CLAUSE;

(D) IF REQUESTED BY TESORO, ANNUALLY CERTIFY COMPLIANCE WITH THIS CLAUSE AND THE APPLICABLE PROHIBITIONS; AND (E) PROMPTLY NOTIFY TESORO OF ANY NOTICE, VIOLATION, FINE OR PENALTY INVOLVING THE APPLICABLE PROHIBITIONS. ANY VIOLATION OF THE APPLICABLE PROHIBITIONS BY OWNER OR CHARTERER WILL DEEMED TO BE A BREACH OF A MATERIAL COVENANT OF THE AGREEMENT; ~~IF TESORO LEARNS OF OR HAS A GOOD FAITH BELIEF THAT OWNER OR CHARTERER OR ANY SUBSIDIARY OR OTHER AFFILIATED ENTITY HAS VIOLATED OR CAUSED TESORO TO VIOLATE ANY OF THE APPLICABLE PROVISIONS, TESORO MAY TERMINATE THIS AGREEMENT NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY. IN THE EVENT OF SUCH TERMINATION, TESORO WILL BE RELIEVED OF ALL LIABILITY AND OBLIGATIONS OF ANY KIND HEREUNDER, INCLUDING ANY LIABILITY TO MAKE PAYMENTS UNDER THIS AGREEMENT~~

CHARTER PARTY FORM: EXXONMOBIL VOY 2000, TERMS AND CONDITIONS TO APPLY WITH FOLLOWING

AMENDMENTS/ADDITIONS:


EXXONMOBIL VOY 2000 PART II

--------------------------

CLS 1 - (D) LINE 10 DELETE "WITH GANGWAY DOWN"


CLS 3 - (B) DELETE


CLS 4 - (B) DELETE THE WORD "TELEX" FROM LINE 54 ADD "EMAIL AND/OR FACSIMILE"


CLS 13 - (C) DELETE AFTER "EFFECTED" FROM LINE 174 TO 176 AND ADD "PROVIDED ALWAYS

THAT IF THE VESSEL IS DETAINED SOLELY FOR THE PURPOSES OF AWAITING CARGO DOCUMENTS

AT LOADPORT FOR MORE THAN THREE(3) HOURS BEYOND THE FINAL DISCONNECTION OF CARGO HOSES,

LAYTIME OF IF THE VESSEL IS ON DEMURRAGE, DEMURRAGE SHALL RECOMMENCE AFTER SUCH PERIOD

OF THREE(3) HOURS AND TERMINATE UPON THE COMPLETION OF CARGO DOCUMENTATION. IF, AFTER

COMPLETION OF LOADING OR DISCHARGING, THE VESSEL IS REQUIRED TO PROCEED TO AN ANCHORAGE

FOR CHARTERERS' PURPOSES, THEN THE TIME SPEND MOVING FROM THE BERTH TO THE ANCHORAGE

SHALL NOT COUNT AS PART OF THE THREE(3) HOURS REFERRED TO ABOVE OR AS LAYTIME, IF

THE VESSEL IS ON DEMURRAGE, AS DEMURRAGE."


CLS 14 - (C) ADD AT END: IF BUNKERING DOES NOT INTERFER WITH BERTHING THEN TIME

BUNKERING TO COUNT AS LAYTIME OR IF ON DEMURRAGE, DEMURRAGE.


CLS 18 - (D) LINE 336, AFTER "VESSEL", INSERT "BEFORE LOADING OR", AFTER "PIPELINES"

INSERT "OR FLOATING HOSES"

AFTER "WATER", INSERT "OR CPP SUPPLIED BY TERMINAL"

LINE 337, ADD AT THE END," OWNER SHALL NOT BE HELD RESPONSIBLE FOR THE DISCOLORATION

OR ANY OTHER CONSEQUENCES RELATED TO THIS PARTICULAR OPERATION".


CLS 18 - (F) LINE 340 INSERT "HOMOGENIOUS" AFTER ENTIRE, DELETE "BE IT ONE

OR MORE GRADES"

LINE 340 INSERT 'AVERAGE' AFTER 'MAINTAIN'

LINE 341 AFTER "DISCHARGE" ADD "EXCLUDING STRIPPING (MAX STRIPPING 3 HOURS)"


CLS 18 - (H) LINE 360, AFTER "DETERMINED BY" DELETE "MUTUALLY AGREEABLE" AND ADD

"THE RECEIVER'S CURRENTLY EMPLOYED INDEPENDENT INSPECTOR"

CLS 25 - LINE 418, AFTER "NEXT TAKEN" ADD "IF THE CARGO FOR THE RESPECTIVE CHARTER PARTY

IS A NO HEAT CARGO AS DESCRIBED IN PART I(F) OF EXXONMOBILVOY 2000, THE CHARTERER SHAL

HAVE THE OPTION TO INCREASE THE CARGO TEMPERATURE UPTO 110 DEGS FAHRENHEIT FOR DISCHARGE.

CHARTERERS SHALL PAY FOR THE ADDITIONAL BUNKERS CONSUMED SOLELY DUE TO THE INCREASE IN

TEMPERATURE AS AFORESAID.


THE PRICING FOR THE ADDITIONAL BUNKERS SHALL BE AT THE OWNER'S DOCUMENTED LAST TAKEN

ACTUAL COST FOR SUCH BUNKERS AT THE PORT WHERE BUNKERS ARE LAST TAKEN" CHARTS TO

INCLUDE HEATING INSTRUCTIONS IN VOYAGE ORDERS.


CLS 26 - DELETE


CLS 27 - (C) DELETE ALL FROM LINES 480 TO LINE 490.


CLS 33 - DELETE (A),

INSERT IN PLACE OF (A) 'OWNER TO COMPLY WITH LATEST IMO AND PORT STATE REGULATIONS'


CLS 36 - LINE 658, AFTER '90 DAYS' INSERT '90 DAYS FOR DEMURRAGE, 120 DAYS FOR

ALL OTHER CLAIMS'


THE FOLLOWING TESORO FAR EAST MARITIME COMPANY CLAUSES AS WRITTEN OCTOBER 2004

Case 1:16-cv-03623-JGK   Document 3-1   Filed 05/16/16   Page 48 of 77

1. PRIVACY - OK

2. ADDITIONAL CARGO INSURANCE - N/A FOR THIS VOYAGE

3. ADDRESS COMMISSION - OK

4. SEA TERMINAL/SPM MOORING CLAUSE - OK

5. MOORING MASTER CLAUSE - APPLICABLE FOR HAWAII ONLY

6. VOYAGE ORDERS ADD "AND CHARTERERS ISSUED VOYAGE ORDERS MUST ALWAYS BE IN

COMPLIANCE WITH ALL TERMS IN REFERENCED RECAP AND/OR CHARTER PARTY"

7. IN TRANSIT LOSS PARA. 1 - DELETE '0.3', INSERT '0.5'.

PARA. 2 - DELETE LAST SENTENCE "CARGO QUANTITIES....SHALL BE CONCLUSIVE".

8. BUNKER CLAUSE DELETE PARA 2. (B) PARA 3. (C) AFTER "AS LAYTIME"

INSERT "SHOULD THE SAID OPERATION DELAY VESSEL"

9. CARBON BLACK CLEANING CLAUSE DELETE – OK

10. DEMURRAGE/EXPENSE LINE 3, AFTER "BUT NOT LIMITED" DELETE "TO ETA NOTICES...

11. SAMPLE AND SURVEY – OK

12. ITF – DELETE ENTIRE CLAUSE AND INSERT "VESSEL IS ITF OR EQUIVELENT"

13. CARGO TRANSFER – OK

14. U.S. CUSTOMS COMPLIANCE/AMS DELETE / INSERT: U.S. CUSTOMS COMPLIANCE/AMS

OWNER WARRANTS THAT IT IS IN COMPLIANCE WITH THE CURRENT US CUSTOMS REGULATIONS

(19 CFR 4.7) OR ANY SUBSEQUENT AMENDMENTS THERETO AND SHALL UNDERTAKE THE ROLE

OF CARRIER FOR THE PURPOSES OF SUCH REGULATIONS AND SHALL, IN THEIR OWN NAME,

TIME AND EXPENSE:

I) POSSESS A SCAC (STANDARD CARRIER ALPHA CODE);

II) POSSESS AN ICB (INTERNATIONAL CARRIER BOND); AND

III) SUBMIT A CARGO DECLARATION BY AMS (AUTOMATED MANIFEST SYSTEM) TO THE US CUSTOMS.

CHARTERER SHALL PROVIDE ALL NECESSARY INFORMATION TO THE OWNERS AND/OR THEIR AGENTS TO

ENABLE THE OWNERS TO SUBMIT A TIMELY AND ACCURATE CARGO DECLARATION.

CHARTERER SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE

OWNERS AGAINST ANY LOSS AND/OR DAMAGE WHATSOEVER AND/OR ANY EXPENSES, FINES, PENALTIES

AND ALL OTHER CLAIMS OF WHATSOEVER NATURE, INCLUDING BUT NOT LIMITED TO LEGAL COSTS,

ARISING FROM THE CHARTERER'S FAILURE TO COMPLY WITH ANY OF THE PROVISIONS OF THIS

SUB-CLAUSE. SHOULD SUCH FAILURE RESULT IN ANY DELAY THEN, NOTWITHSTANDING ANY PROVISION

IN THIS CHARTER PARTY TO THE CONTRARY, ALL TIME USED OR LOST SHALL COUNT AS LAYTIME OR,

IF THE VESSEL IS ALREADY ON DEMURRAGE, TIME ON DEMURRAGE.


OWNERS SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE

CHARTERER AGAINST ANY LOSS AND/OR DAMAGE WHATSOEVER (INCLUDING CONSEQUENTIAL LOSS

AND/OR DAMAGE)AND ANY EXPENSES, FINES, PENALTIES AND ALL OTHER CLAIMS OF WHATSOEVER

NATURE, INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE OWNERS' FAILURE TO

COMPLY WITH ANY OF THE PROVISIONS OF SUB-CLAUSE (A). SHOULD SUCH FAILURE RESULT IN ANY

DELAY THEN, NOTWITHSTANDING ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY, ALL

TIME USED OR LOST SHALL NOT COUNT AS LAYTIME OR, IF THE VESSEL IS ALREADY ON DEMURRAGE,

TIME ON DEMURRAGE.


THE ASSUMPTION OF THE ROLE OF CARRIER BY THE OWNERS PURSUANT TO THIS CLAUSE AND FOR

THE PURPOSE OF THE US CUSTOMS REGULATIONS (19 CFR 4.7) SHALL BE WITHOUT PREJUDICE TO

THE IDENTITY OF CARRIER UNDER ANY BILL OF LADING, OTHER CONTRACT, LAW OR REGULATION.


IF REQUESTED BY CHARTERER, OWNER TO PROVIDE A COPY OF THEIR INTERNATIONAL CARRIER

BOND FORM WITHIN 5 WORKING DAYS AFTER THE VESSEL IS FIXED OR 5 DAYS BEFORE ARRIVAL

DISCHARGE PORT WHICHEVER IS EARLIER. IF OWNERS ARE UNABLE TO COMPLY IN A TIMELY

MANNER, CHARTERER'S WILL INFORM OWNER AND PROCEED TO INSTRUCT DESIGNATED 3RD PARTIES

TO ARRANGE AND FILE ON OWNERS BEHALF. COST AND TIME, INCLUDING ANY DELAYS ASSOCIATED

WITH THESE REQUIREMENTS, WILL BE FOR OWNERS ACCOUNT AND TO BE SETTLED DIRECTLY BY THEM.

WILL ADVISE BOND NUMBER/EXPIRY DATE.

15. FPSO CLAUSE - DELETE, N/A THIS VOYAGE

16. NOTICES - OK

17. OCEANROUTES - DELETE

18. BIMCO STANDARD ISM CLAUSE - OK

19. ALASKA CLAUSE - DELETE

20. HYDROGEN SULPHIDE (H2S) - LAST PARA. DELETE "A REASONABLE TIME" AND

INSERT "A PERIOD EQUAL TO AGREED LAYTIME"

21. PART CARGO (DEMURRAGE) - DELETE

22. CLEARANCE - ADD AT END "HOWEVER, WHERE THE VESSEL IS INSTRUCTED TO WAIT AT ANCHORAGE,

AND IT IS NOT CUSTOMARY TO GRANT PORT CLEARANCE AT ANCHORAGE, THIS CLAUSE WILL NOT APPLY

UNTIL SUCH TIME AS CLEARANCE IS CUSTOMARILY GIVEN/REJECTED."

23. SPEED - 1ST PARA. ONLY, INSERT "12.5 KTS WSNP"

24. ADDITIONAL LOAD/DISCHARGE PORT(S) - DELETE N/A

25. JAPAN CLAUSE - DELETE

26. KOREA CLAUSE - DELETE

27. CHARTER PARTY ADMINISTRATIVE CLAUSE - OK

28. QUESTIONNAIRE(S) - OK

29. ISPS CLAUSE FOR VOYAGE CHARTER PARTIES - OK

30. CERTIFICATE OF COMPLIANCE (COC) -OK

SEA TERMINAL / SPM MOORING CLAUSE

OWNER WARRANTS THAT:

A) THE VESSEL IS FULLY FITTED WITH PROPERLY FUNCTIONING MOORING GEAR AND
OTHER EQUIPMENT AS SPECIFIED IN THE LATEST EDITION OF THE OCIMF "RECOMMENDATIONS
FOR EQUIPMENT EMPLOYED IN THE MOORING OF SHIPS AT SINGLE POINT MOORINGS", AND
THAT THE VESSEL WILL MAINTAIN SUCH GEAR AND EQUIPMENT IN PROPER WORKING ORDER

B) THE VESSEL WILL FULLY COMPLY WITH AND FOLLOW THE OPERATIONAL PROCEDURES AS

OUTLINED IN THE LATEST EDITION OF THE OCIMF "SINGLE POINT MOORING & OPERATIONS GUIDE",

AND WILL FULLY COMPLY WITH AND FOLLOW THE LATEST EDITION OF THE OCIMF/ ICS PUBLICATION

"INTERNATIONAL SAFETY GUIDE FOR OIL TANKERS AND TERMINALS".

C) AT ALL TIMES WHILE THE VESSEL IS BERTHED AT A SEA TERMINAL OR SPM, ITS MAIN ENGINES,

STEERING MACHINERY AND ITS NECESSARY EQUIPMENT SHALL BE MAINTAINED IN A CONDITION TO

ALLOW IMMEDIATE MANEUVERING OF THE VESSEL.

D) THE VESSEL WILL FULLY COMPLY WITH ALL APPLICABLE INTERNATIONAL AND NATIONAL, INCLUDING

U.S. COAST GUARD, REQUIREMENTS, REGULATIONS AND PROCEDURES INCLUDING BUT NOT LIMITED TO

THE MAINTENANCE OF A QUALIFIED LIVE BRIDGE WATCH AND A BOW WATCH AT ALL TIMES WHILE THE

VESSEL IS AT A SEA TERMINAL OR SPM.

CALIFORNIA NAVIGATION

A) WHEN ARRIVING OR DEPARTING THE PORTS OF LOS ANGELES & LONG BEACH, VESSELS SHALL

PROCEED AT SPEEDS NOT EXCEEDING 12 KNOTS WHEN INSIDE A 40 NAUTICAL MILE RADIUS OF

POINT FERMIN IN ACCORDANCE WITH THE PORTS' GREEN FLAG PROGRAM.

(B) IN ADDITION TO PUBLISHED TANKER EXCLUSION ZONES, VESSELS SHALL:

TRANSIT ALONG THE US WEST COAST BETWEEN SAN DIEGO, CALIFORNIA AND THE STRAITS OF

JUAN DE FUCA AT LEAST 50 NAUTICAL MILES OFFSHORE, EXCEPT WHEN MAKING AN APPROACH TO
OR DEPARTURE FROM PORT.

C) ARRIVE AND DEPART LOS ANGELES AND LONG BEACH HARBORS, WITH COURSE LINES AS CLOSE
AS PRACTICABLE TO A DUE EAST OR WEST HEADING UNTIL 50 NAUTICAL MILES FROM LAND. NOT
USE THE SANTA BARBARA CHANNEL.

TASC APPROVAL CONDITIONS

------------------------

(CONFIRMED BY MASTER UNDER SEPARATE EMAIL AS BELOW)

* ALL CARGO MUST BE LOADED, CARRIED, DISCHARGED, SAMPLED
AND GAUGED IN A CLOSED, INERTED CONDITION.---- CAN COMPLY

* VESSEL MUST AFFIRM COMPLIANCE WITH MARPOL ANNEX VI, APPENDIX
VII EFFECTIVE 01 JANUARY 2015 PERTAINING TO THE CONTROL OF EMISSIONS
FROM THE MAIN ENGINE, AUXILIARY ENGINE(S), AND BOILERS WHILE THE VESSEL
IS OPERATING IN NA-ECA WITHIN 200 NAUTICAL MILES OF THE SHORELINE OF
U.S. INCLUDING THE HAWAII ISLANDS, WITH MARINE FUEL MAXIMUM OF 0.1 PERCENT
SULFUR BY WEIGHT. IF REQUESTED, MUST PROVIDE TESORO WITH A COPY OF THE
SIGNED AND STAMPED PROOF OF COMPLIANCE.------ CAN COMPLY

* WHEN ARRIVING OR DEPARTING THE PORTS OF LOS ANGELES & LONG BEACH, VESSELS
SHALL PROCEED AT SPEEDS NOT EXCEEDING 12 KNOTS WHEN INSIDE A 40 NAUTICAL

* IN ADDITION TO PUBLISHED TANKER EXCLUSION ZONES, VESSELS SHALL TRANSIT
ALONG THE US WEST COAST BETWEEN SAN DIEGO, CALIFORNIA AND THE STRAITS OF
JUAN DE FUCA AT LEAST 50 NAUTICAL MILES OFFSHORE OF THE NEAREST LAND,
EXCEPT WHEN MAKING AN APPROACH TO OR DEPARTURE FROM PORT.------ CAN COMPLY


* WHEN ARRIVING FROM OR DEPARTING TO POINTS TO THE NORTH OF LOS ANGELES,
LONG BEACH HARBORS AND EL SEGUNDO, VESSELS SHALL PROCEED ALONG A COURSE
LINE AS CLOSE AS PRACTICABLE TO DUE EAST OR DUE WEST BETWEEN SANTA CATALINA,
SANTA BARBARA, AND SAN NICOLAS ISLANDS TO THE SOUTH AND SANTA CRUZ, SANTA ROSA
AND SAN MIGUEL ISLANDS TO THE NORTH, UNTIL 50 NAUTICAL MILES FROM LAND.  VESSELS
SHALL NOT TRANSIT THE SANTA BARBARA CHANNEL UNDER ANY CIRCUMSTANCES.  WHEN
ARRIVING FROM OR DEPARTING TO POINTS TO THE SOUTH OF LOS ANGELES, LONG BEACH
HARBORS AND EL SEGUNDO, VESSELS SHALL PROCEED BY WAY OF THE SOUTHBOUND TRAFFIC
SEPARATION SCHEME IN THE GULF OF SANTA CATALINA EAST OF SANTA CATALINA AND
SAN CLEMENTE ISLANDS.------ CAN COMPLY

* DUE TO THE HEIGHT OF THE KTM THE VESSEL MUST WORK CLOSELY WITH SAN FRANCISCO
PILOTS TO SAFELY TRANSIT CARQUINEZ BRIDGE ENROUTE TO TESORO GOLDEN EAGLE
AMORCO MARTINEZ TERMINAL. ------ CAN COMPLY


* OFFICIAL CLASS DEADWEIGHT SHALL NOT EXCEED 125,000 DWT FOR CALLING PUGET SOUND.

------------

END RECAP

THANK YOU FOR YOUR SUPPORT.

BEST REGARDS

SIMPSON | SPENCE | YOUNG



SIMPSON | SPENCE | YOUNG

**ssyonline.com** 

---

SSY Tankers New York LLC part of SIMPSON | SPENCE | YOUNG

Details of all SIMPSON | SPENCE | YOUNG group companies can be found at http://www.ssyonline.com/registered-offices.shtml

The SIMPSON | SPENCE | YOUNG policy on international sanctions can be found at http://www.ssyonline.com/disclaimer.shtml

No Attachment

# ExxonMobil

<u>tanker voyage charter party</u>

ExxonMobil VOY2000

## PREAMBLE

| PLACE | DATE |
| --- | --- |

IT IS THIS DAY AGREED between _____ Owner / Chartered Owner
(hereinafter called "Owner") of the _____ Flag MS / SS_____
(hereinafter called "Vessel") and _____(hereinafter called "Charterer") that the transportation herein provided for shall be performed subject to the terms and conditions of this Charter, which includes this Preamble and Part I and II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II to the extent of such conflict.

## PART I

**(A) VESSEL DESCRIPTION AND POSITION:**

Year built:                    Classed:

Summer Deadweight:                    Metric tons on          feet/meters in salt water on assigned summer freeboard.

Maximum Cargo Capacity:                    Metric tons          % more or less. Vessel's option.

Cubic capacity for cargo (at 98%):                    cubic meters/barrels.

Length overall:          feet/meters          Beam:          feet/meters

Inert Gas System:     ☐ Yes     ☐ No

Crude Oil Wash System:          ☐ Yes     ☐ No. If Crude Oil Wash is required, the allowed pumping hours specified in Part II, Clause 18 (g) shall be increased by a maximum of          hours pursuant to Part II, Clause 18 (g)

Vessel has full segregated ballast tanks (SBT):     ☐ Yes     ☐ No

Vessel has clean ballast tanks (CBT):     ☐ Yes     ☐ No

Cargo Tanks Coated:          ☐ Yes     ☐ No     Type:

Cargo Tanks Coiled:          ☐ Yes     ☐ No     Type:

Last cargo:                    Next to last cargo:

Vessel onboard quantity (gross standard volume) on date of Charter:

Vessel location on date of Charter:

Expected ready to load:

Charter speed in all weather:          knots laden.

**(B) LAYDAYS:**          Commencing:          Cancelling:

**(C) LOADING RANGE(S) / PORT(S) / PLACE(S):** One (1) or          safe

(D) DISCHARGING RANGE(S) / PORT(S) / PLACE(S):  One (1) or                    safe

(E) **CARGO QUANTITY:**

Full Cargo as defined in Part II, Clause 1 subject to the Maximum Cargo Capacity limits specified in Part I(A): ☐ Yes          ☐ No
or
Part Cargo Minimum                            Metric tons with Charterer's option to load up to Full Cargo as described in this
Paragraph (E); provided Part Cargo Minimum is supplied by Charterer, no deadfreight for Charterer's account whether option
exercised or not.

(F) **CARGO DESCRIPTION:**

(G) **FREIGHT RATE:**

Freight rate for Full Cargo or Part Cargo Minimum (hereinafter called "Base Freight Rate"):

Freight rate for quantity above Part Cargo Minimum (hereinafter called "Overage Freight Rate"):

(H) **BILLING:**

Freight, deadfreight, demurrage and any other monies payable to Owner pursuant to this Charter shall be payable in
United States dollars and invoiced to Charterer at:

and paid to Owner at:

(I) **LAYTIME:**          Total Laytime in running hours:

(J) **DEMURRAGE / DEVIATION PER DAY:**

In accordance with Part II, Clause 8, demurrage and/or deviation per day shall be based on:

Summer deadweight of                          Metric tons
or
Part Cargo Minimum plus                       Metric tons totalling                    Metric tons
or
United States dollars                         per day pro rata

(K) **SPECIAL PROVISIONS:**

(L) **INCORPORATED CLAUSE(S):**

The following specified Clause(s), the text(s) of which are attached hereto, shall be deemed incorporated in and made
a part of this Part I.

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in
duplicate as of the day and year first above written.

WITNESS: _____

                                              By: _____
                                                                Owner

         _____

                                              By: _____
WITNESS: _____                     Charterer

         _____     By: _____

1. **DEFINITIONS.** In this Charter:
   (a) "place" shall mean any berth, dock, anchorage, sea terminal, submarine line, alongside vessel and/or lighter, whether at anchor or underway, and/or any other place to which Charterer is entitled to order Vessel hereunder.
   (b) "ILL Convention" shall mean the International Load Line Convention, 1966, or any amendment thereof as may be applicable to the voyage(s) to be performed hereunder.
   (c) "Full Cargo" shall mean a cargo which fills Vessel to its minimum freeboard, as permitted by the ILL Convention, or fills the cubic capacity of Vessel's available cargo spaces, whichever occurs first, after leaving appropriate space in the tanks for the expansion of cargo.
   (d) "Arrival in Berth" shall mean the completion of mooring of the Vessel when loading or discharging at a sea terminal, Vessel being all fast with gangway down and secure when loading or discharging alongside a wharf/berth or Vessel being all fast alongside a barge, lighter or other vessel when loading from or discharging to a barge, lighter or other vessel.
   (e) Where it is stipulated herein that the Vessel shall meet some "requirement", such stipulation shall be taken to include any requirement that might be placed upon the Owner, operator, and/or personnel of the Vessel.

2. **VESSEL.**
   (a) **DESCRIPTION / CONDITION.** Owner warrants that, from the time when the obligation to proceed to the loading port(s) or place(s) attaches and throughout Vessel's service under this Charter, Vessel shall be as described in Part I (A). Owner further warrants that, during the period just described, Owner shall exercise due diligence to ensure that Vessel and its hull, machinery, boilers, all tanks and all other equipment including, but not limited to, pipes, pumps, valves, inert gas and crude oil wash systems (if Vessel is so equipped), navigational equipment, heating coils and facilities, shall be fully functional and in good working order and condition and in every way seaworthy and fit to carry cargo and perform the voyage(s) required under this Charter.
   (b) **COMPLEMENT.** Owner warrants that, during the period described in Paragraph (a) of this Clause, Vessel shall have a full and efficient complement of Master, officers and crew, with adequate training and experience in operating all Vessel's equipment, including, but not limited to, inert gas and crude oil wash systems (if Vessel is so equipped), and that Master and all officers shall possess valid and current certificates/documents issued or approved by the country of Vessel's registry. Owner further warrants the conversational English language proficiency of Master and officer(s) in charge of cargo and bunker oil handling.
   (c) **COMPLIANCE.** Owner warrants that Vessel shall, during the period described in Paragraph (a) of this Clause, be in full compliance with all applicable international conventions, all applicable laws, regulations and/or other requirements of the country of Vessel registry and of the countries of the port(s) and/or place(s) to which Vessel may be ordered hereunder and all applicable regulations and/or requirements of any terminals or facilities in such port(s) or place(s) where Vessel shall load or discharge. Owner further warrants that Vessel shall have on board, during the subject period, all certificates, records or other documents required by the aforesaid conventions, laws, regulations and/or requirements.
   (d) **BREACH.** If any of the warranties stipulated in this Clause are breached, any delay resulting therefrom shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, and any expense attributable to such delay shall be for Owner's account.
   (e) **SALE.** Owner warrants that the Vessel has not been sold, is not on offer to be sold, and will not be offered for sale during the period of this Charter.

3. **CLEANING.**
   (a) Owner shall clean the tanks, pipes and pumps of Vessel at its expense to the satisfaction of Charterer's representative(s). If the cargo specified in Part I (F) is clean product and inspection of the tanks is required, Owner shall gasfree the tanks as necessary. Any time used for tank inspection and any re-inerting of Vessel shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Any time required for cleaning and gasfreeing shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Compliance with this Clause shall not be deemed compliance with Owner's obligations under Clause 2, which are in no way lessened by this Clause.
   (b) Vessel shall not be responsible for any admixture, if more than one quality of oil is shipped, nor for contamination or deterioration in quality of the cargo unless the admixture, contamination or deterioration results from (i) unseaworthiness existing at the inception of loading which was discoverable by the exercise of due diligence or (ii) error or fault of the servants of Owner in the loading, care or discharging of the cargo.

4. **VOYAGE(S).**
   (a) Vessel shall proceed with utmost dispatch to any port(s) or place(s) as ordered by Charterer in accordance with Part I (C) and there load a cargo as specified in Part I (E) and (F). On completion of loading, Vessel shall then forthwith proceed to any port(s) or place(s) as ordered by Charterer in accordance with Part I (D) and there deliver said cargo. Except when required by reason of Vessel fault, lightering within port limits shall be at Charterer's expense.
   (b) Owner shall timely transmit Charterer's voyage instructions in their entirety to the Vessel. Owner shall ensure that Charterer is promptly advised of all accidents to, and/or pollutions involving, the Vessel and of any Vessel system failure. Such advice shall be given by telephone or telex (if by telephone, same shall be confirmed by telex).
   (c) Owner warrants that, throughout Vessel's service under this Charter, Owner shall have full and valid Protection and Indemnity Insurance ("P&I Insurance") for the Vessel, as described herein, with the P&I Insurance placed with a P&I Club which is a Member of the International Group of P&I Clubs. This P&I Insurance shall be at no cost to Charterer. The P&I Insurance must include full coverage against liability for cargo loss/damage and coverage against liability for pollution for an amount not less than US $1,000 Million (One Billion Dollars) per incident. If requested by Charterer, Owner shall promptly furnish to the Charterer proper evidence of such P&I Insurance upon signing this Charter or at any time during the Charter term. The above warranty is to be regarded as an essential part of this Charter, which is conditional on its truth or performance, so that its breach entitles the Charterer, in Charterer's option, to terminate the Charter and/or to recover any damages allowable in law.

5. **MAXIMUM CARGO.** In no event shall Charterer be required to provide, nor shall Vessel load, a cargo quantity in excess of a Full Cargo. In addition, Charterer shall not be required to provide a cargo quantity in excess of the maximum cargo capacity specified in Part I (A). All time lost and expense incurred by reason of Vessel loading a quantity of cargo which puts Vessel, at any stage of the voyage(s) hereunder, below the marks permissible under the ILL Convention shall be for Owner's sole account.

6. **FREIGHT.**
   (a) Freight shall be paid at the rate stipulated in Part I (G) and shall be computed on gross quantity as stated on the Bill of Lading and on quantity of documented tank washings if freight thereon is payable in accordance with Clause 33 (a); provided, however, that no freight shall be payable on any quantity of cargo which puts Vessel, at any stage of the voyage(s) hereunder, below the marks permissible under the ILL Convention. Deadfreight shall be paid in accordance with Clause 7. Except as provided in Clause 18 (n), no deduction from freight shall be made for water and/or sediment contained in the cargo, nor for any claim Charterer or cargo interests may have against Owner or Vessel arising under this Charter or Bills of Lading issued for the cargo. Payment of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70
71
72
73

freight shall be made by Charterer without discount upon Charterer's receipt of notice of completion of discharge of cargo at last    74
discharging place less any disbursements made to Master or Owner's agent(s) at port(s) or place(s) of loading and/or discharging    75
plus cost of insurance, commissions and expenses on said disbursements and any other costs incurred by Charterer on Owner's    76
behalf pursuant to this Charter.    77
(b) WORLDSCALE.  Unless otherwise stipulated herein, all rates, hours, terms and conditions in the Worldwide Tanker Nominal    78
Freight Scale current on the date of this Charter (hereinafter called "WORLDSCALE") shall apply to this Charter regardless of    79
when Vessel loads.    80
(c) If cargo is carried between places and/or by a route for which no rate is expressed in WORLDSCALE, then, in the absence of    81
agreement as to the freight rate, the parties hereto will apply to either of the publishers of WORLDSCALE for a binding determination    82
of an appropriate WORLDSCALE rate.    83
(d) Regardless of whether or not the freight specified in Part I (G) is lumpsum, for the purposes of Section 4(5) of the Carriage of    84
Goods by Sea Act of the United States, or the corresponding provisions of any international regime that may otherwise apply in    85
accordance with Clause 27, Owner and Charterer agree that the customary freight unit, shipping unit or unit (as the case may be)    86
of the cargo is Metric ton.    87

7.    DEADFREIGHT. Should the entire cargo quantity specified in Part I (E) not be supplied, Master shall give immediate notice to    88
Charterer by electronic mail, telex, facsimile or radio that such cargo quantity has not been furnished, indicating shortage, and    89
shall then await Charterer's instructions. Should Charterer fail to provide further cargo, Vessel, upon request of Charterer, shall    90
then proceed on its voyage provided that the tanks in which the cargo is loaded are sufficiently filled to put it in a seaworthy condition.    91
If any delay is caused to Vessel by reason of Master waiting for Charterer's instructions as aforesaid, such delay shall count as    92
laytime or, if Vessel is on demurrage, as time on demurrage and any expense incurred by Vessel attributable solely to such delay    93
shall be for Charterer's account. Deadfreight shall be paid at the Base Freight Rate on the shortage (being the difference between    94
the cargo quantity specified in Part I (E) and the quantity loaded as shown on the Bills of Lading) provided such deadfreight charge    95
is fully documented by cable advice from Master or by deadfreight certificate. Charterer shall be credited with any freight on    96
residues earned by Owner in accordance with Clause 33(a)(iii).    97

8.    DEMURRAGE / DEVIATION RATE.  The rate for demurrage and/or deviation shall be the fixed dollar figure specified in Part I (J)    98
or the rate derived by determining the applicable rate from the WORLDSCALE Demurrage Table for tonnage specified in Part I (J)    99
and multiplying that rate by the Base Freight Rate. If a Part Cargo Minimum basis is specified in Part I (E) and Charterer exercises    100
its option to load additional cargo, any demurrage and/or deviation shall, nevertheless, remain payable at either the aforesaid fixed    101
dollar rate or at the aforesaid rate based on the tonnage specified in Part I (J), whichever is applicable. The applicable rate under    102
this Clause shall hereinafter be called "Demurrage Rate" or "Deviation Rate" as is appropriate.    103

9.    LOADING AND DISCHARGING PORT(S) / PLACE(S).    104
(a) Charterer shall nominate loading or discharging port(s) and/or place(s) or order Vessel to a destination for orders. If Vessel is    105
ordered to a destination for orders, Charterer shall thereafter nominate loading or discharging port(s) and/or place(s). All such    106
nominations or orders shall be made in sufficient time to avoid delay to Vessel.    107
(b) CHANGE OF DESTINATION.  After nominating loading and/or discharging port(s) or place(s) pursuant to Paragraph (a) of    108
this Clause, Charterer may nominate new port(s) or place(s), whether or not they are within the range of the previously nominated    109
port(s) or place(s) and/or vary the rotation of any nominated port(s) or place(s) and Owner shall issue instructions necessary to    110
make such change(s).  It is understood and agreed, however, that the aforesaid option to nominate new loading port(s) or place(s)    111
in different ranges shall lapse on Vessel tendering Notice of Readiness at a nominated loading port or place and that aforesaid    112
option to nominate new discharging port(s) or place(s) in different ranges shall lapse on Vessel tendering Notice of Readiness at    113
a nominated discharging port or place.  If a change to, or varying the rotation of, nominated port(s) or place(s) occurs or if Vessel    114
is sent to a destination for orders, any time by which the steaming time to the port(s) or place(s) to which Vessel is finally ordered    115
exceeds that which would have been taken if Vessel had been ordered to proceed to such port(s) or place(s) in the first instance    116
shall be compensated at the Deviation Rate per running day and pro rata for a part thereof. In addition, Charterer shall pay for    117
extra bunkers consumed during such excess time at Owner's documented actual replacement cost at the port where bunkers are    118
next taken    119
(c) Any order of Vessel to a destination for orders, all nominations and any renominations pursuant to this Clause shall be consistent    120
with Part I (C) and (D).    121

10.    ESTIMATED TIME OF ARRIVAL (ETA).    122
(a) Unless otherwise instructed, the following Estimated Time of Arrival (ETA) notifications shall be given. As soon as commencing    123
the voyage to the nominated loading port(s) or place(s), Master shall advise Charterer and Vessel's agent of Vessel's estimated    124
date and time of arrival at the nominated loading port(s) or place(s).  Further, provided the length of the voyage permits, Master    125
shall confirm or amend such advice seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at the loading    126
port(s) or place(s). On leaving the final loading port or place, Master shall advise Charterer and Vessel's agent of Vessel's estimated    127
date and hour of arrival at the nominated discharging port(s) or place(s).  Further, provided the length of the voyage permits,    128
Master shall confirm or amend such advice seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at    129
the discharging port(s) or place(s).  In addition, on leaving the final loading port or place, Master shall advise Charterer of expected    130
maximum draft at arrival and, provided the length of voyage permits, shall confirm or amend such advice no later than seventy-two    131
(72) hours prior to Vessel's arrival at the discharging port(s) or place(s).    132
(b) An alteration of more than three (3) hours in the twenty-four (24) hour notice or an alteration of more than twelve (12) hours    133
in any other advice given pursuant to Paragraph (a) of this Clause shall be advised by Master to Charterer and Vessel's agent.    134
(c) If, for any reason, Vessel is unable to trim to even keel for arrival at the discharging port(s) or place(s), Master shall give notice    135
of this to Charterer as soon as possible after receiving such loading instructions but no later than sailing from the final loading port    136
or place.  Such notice shall include Vessel's estimated arrival draft forward and aft.    137
(d) If Master fails to comply with the requirements of Paragraphs (a), (b) and/or (c) of this Clause, any delay resulting therefrom    138
at loading and/or discharging port(s) or place(s) shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.    139
(e) At each loading and/or discharging port or place, Master or Vessel's agent shall promptly notify Charterer of the dates and times    140
the following events occurred:    141
    •  Notice of Readiness to load/discharge tendered;    142
    •  All fast;    143
    •  Hoses connected;    144
    •  Hoses disconnected;    145
    •  All cargo documents on board; and    146
    •  Vessel sailed.    147
(f) All advices and notifications required by this Clause shall be made by electronic mail, telex, facsimile or radio (if radio,    148

subsequently confirmed in writing).

11.   NOTICE OF READINESS. Upon arrival at customary anchorage or waiting place at each loading and discharging port or place, Master or Vessel's agent shall give Charterer or its representative notice by letter, electronic mail, telex, facsimile, radio or telephone (if radio or telephone, subsequently confirmed promptly in writing) that Vessel is in all respects ready to load or discharge cargo, berth or no berth.

12.   CANCELLATION OF CHARTER. If Vessel has not tendered a valid Notice of Readiness by 1600 hours local time on the Cancelling Date specified in Part I (B), Charterer shall have the right to cancel this Charter by notifying Owner or Owner's agent by telephone, electronic mail, telex or facsimile (if telephone, subsequently confirmed promptly in writing) of such cancellation within forty-eight (48) hours local time after expiration of the said Cancelling Date, failing which this Charter shall remain in full force and effect. Charterer's said option shall continue to apply even if Vessel tenders Notice of Readiness within that just-mentioned forty-eight (48) hour period. However, if Vessel is delayed by reason of Charterer's change of orders pursuant to Clause 9 and/or by ice risks as stipulated in Clause 21, the said Cancelling Date shall be extended, with the option of cancellation as aforesaid, by any time so directly lost. Cancellation or failure to cancel shall be without prejudice to any claims for damages Charterer may have for late tender of Vessel's services.

13.   LAYTIME / DEMURRAGE.

(a) COMMENCEMENT / RESUMPTION. Laytime or time on demurrage, as herein provided, shall commence or resume upon the expiration of six (6) hours after receipt by Charterer or its representative of Notice of Readiness or upon Vessel's Arrival in Berth, whichever occurs first. Laytime shall not commence before 0600 hours local time on the Commencing Date specified in Part I (B) unless Charterer shall otherwise agree, in which case laytime shall commence upon commencement of loading.

(b) EARLY LOADING. In the event Charterer agrees to load Vessel prior to commencement of laydays, laytime will begin at commencement of loading and the amount of time from commencement of loading until 0600 hours local time on the commencing date specified in Part I (B), shall be added to the laytime specified in Part I (I).

(c) DURATION. The laytime specified in Part I (I) shall be allowed free of expense to Charterer for the purpose of loading and discharging cargo and all other Charterer's purposes. Laytime or, if Vessel is on demurrage, time on demurrage, shall continue until all cargo hoses have been completely disconnected upon the final termination of the loading or discharging operation. Disconnection of all cargo hoses shall be promptly effected. If Vessel is delayed in excess of two (2) hours after such disconnection of cargo hoses solely for Charterer's purpose, laytime or, if Vessel is on demurrage, time on demurrage shall resume upon the expiration of said two (2)-hour period and shall continue from that point until the termination of such delay.

(d) PAYMENT. Charterer shall pay demurrage per running day and pro rata for a part thereof for all time by which the allowed laytime specified in Part I (I) is exceeded by the time taken for loading and discharging and for all other Charterer's purposes and which, under this Charter, counts as laytime or as time on demurrage.

14.   LAYTIME / DEMURRAGE CONSEQUENCES.

(a) SPECIFIED. Any delay to Vessel after the expiration of six (6) hours from Charterer's receipt of Notice of Readiness before Arrival in Berth or any delay to Vessel after Arrival in Berth, due to unavailability of berth (prior to Arrival in Berth), unavailability of cargo, or solely for Charterer or terminal purposes, shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(b) HALF-RATE DEMURRAGE. If demurrage is incurred and the Vessel has been delayed in berthing, loading and/or discharging (hereinafter in this Paragraph (b) called "Delay") due to: weather and/or sea conditions (irrespective of any option given in Part I (C) and (D)); fire; explosion; strike, picketing, lockout, slowdown, stoppage or restraint of labor; breakdown of machinery or equipment in or about the facilities of Charteror, supplier, shipper or consignee of the cargo (hereinafter in this Paragraph (b) separately and jointly called "Listed Conditions"), be the Delay prior to or after the expiration of laytime, that span of time on demurrage equal to the period or periods of Delay as just described shall be paid at half of the Demurrage Rate. If, during a period of Delay, Listed Conditions co-existed, along with any of the other conditions described in Paragraph (a) of this Clause 14, the Listed Conditions shall conclusively be deemed to be sole cause of the Delay, either if they caused the Delay independently of the other conditions or could have caused the Delay if the other conditions had not so co-existed. Weather and/or sea conditions shall include, but not be limited to, lightning, restricted visibility (the term "restricted visibility" shall mean any condition in which visibility is restricted by fog, mist, falling snow, heavy rainstorms, sandstorms and any other similar causes), storm, wind, waves and/or swells. The foregoing provisions as to payment of half the Demurrage Rate in respect to weather and/or sea conditions shall not apply where the Vessel is lightered or discharged at sea.

(c) EXCLUSIONS. Notwithstanding the provisions of any other Paragraph of this Clause or any other Clause of this Charter to the contrary, time shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, if such time is spent or lost:

(i)   As a result of labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor involving Master, officers or crew of Vessel or tugboats or pilots unless, in the case where Charterer has load/discharge port options, a labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor of tug boats or pilots, is in force at the port at the time Charterer nominated such port;

(ii)   On an inward passage, including, but not limited to, awaiting daylight, tide, tugs or pilot, and moving from anchorage or other waiting place, even if lightering has taken place at the anchorage or other waiting place, until Vessel's Arrival in Berth;

(iii)   Due to overflow, breakdown, inefficiency, repairs, or any other conditions whatsoever attributable to Vessel, Master, officers, crew and/or Owner, including inability to load or discharge the cargo within the time allowed and/or failure to meet Vessel warranties stipulated in this Charter;

(iv)   Due to Owner or port authority prohibiting loading or discharging;

(v)   By reason of local law or regulations, action or inaction by local authorities (including, but not limited to, Coast Guard, Naval, Customs, Immigration or Health authorities), with the exception, however, of port closure due to weather and/or sea conditions;

(vi)   In ballasting or deballasting, lining up and/or draining of pumps/pipelines, cleaning of tanks, pumps, pipelines, bunkering or for any other purposes of the Vessel only, unless same is carried out concurrent with loading and/or discharging so that no loss of time is involved; or

(vii)   Due to an escape or discharge of oil or the threat of an escape or discharge of oil on or from Vessel. (The phrase "threat of an escape or discharge of oil" shall for the purposes of this paragraph (vii) mean a grave and imminent danger of the escape or discharge of oil which, if it occurred, would create a serious danger of pollution damage).

(d) OTHER REFERENCES. Laytime and demurrage references are also contained in the following Clauses:

| Clause: | 2 | (d) | Vessel-Breach |
|---|---|---|---|
| | 3 | (a) | Cleaning |
| | 5 | | Maximum Cargo |
| | 7 | | Deadfreight |
| | 8 | | Demurrage/Deviation Rate |

149
150
151
152
153
154
155
156
157
158
159
160
161
162
163
164
165
166
167
168
169
170
171
172
173
174
175
176
177
178
179
180
181
182
183
184
185
186
187
188
189
190
191
192
193
194
195
196
197
198
199
200
201
202
203
204
205
206
207
208
209
210
211
212
213
214
215
216
217
218
219
220
221
222
223

| | | | |
|---|---|---|---|
| 10 | (d) | Estimated Time of Arrival (ETA) | 224 |
| 13 | | Laytime/Demurrage | 225 |
| 15 | (a) | Lightering/Discharge at Sea/Cargo Advisor | 226 |
| 16 | (c) and (d) | Shifting and Off Berth | 227 |
| 17 | (d) | Cargo Measurement | 228 |
| 18 | (a) (c) (d) (f) and (g) | Pumping In and Out | 229 |
| 19 | | Back Loading | 230 |
| 21 | (b) | Ice-At Port | 231 |
| 22 | | Dry Cargo | 232 |
| 23 | | Quarantine | 233 |
| 24 | (b) | Inspection-Bunker Sampling | 234 |
| 25 | | Heat | 235 |
| 27 | (c) | Bills of Lading | 236 |
| 29 | (b) | Exceptions | 237 |
| 33 | (a) | Clean Seas-Handling of Tank Washings | 238 |
| 36 | | Waiver of Claims | 239 |

(e)  UNSPECIFIED.  Any delays for which laytime/demurrage consequences are not specifically allocated in this or any other 240
Clause of this Charter and which are beyond the reasonable control of Owner or Charterer shall count as laytime or, if Vessel is 241
on demurrage, as time on demurrage.  If demurrage is incurred, on account of such delays, it shall be paid at half the Demurrage 242
Rate. 243

15.     LIGHTERING / DISCHARGE AT SEA / CARGO ADVISOR. 244
(a)  Except when required by reason of fault attributable to Vessel, any lightering or discharge at sea or at a place outside a port 245
shall be at the expense of Charterer and, notwithstanding Clauses 11, 13 (a) and 14 (a) and (b), time used for such lightering or 246
discharge shall count as laytime or as time on demurrage, as provided below: 247
        (i)  If Vessel is lightered at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage shall 248
commence when Vessel arrives at the lightering site designated by Charterer and shall end when disconnecting of the cargo hoses 249
from the last cargo receiving vessel has been completed. 250
        (ii)  If Vessel is fully discharged at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage 251
shall commence upon the expiration of six (6) hours after Vessel arrives at the lightering site designated by Charterer or when Vessel 252
is all fast alongside the first cargo receiving vessel, whichever occurs first, and end when disconnection of the cargo hoses from the 253
last cargo receiving vessel has been completed. 254
(b)  If Vessel is fully discharged at sea, freight payment shall, in the absence of agreement as to the appropriate freight rate, be 255
based on the freight rate stipulated in Part I (G) multiplied by a flat rate which shall be obtained from the Worldscale Association 256
(London) Limited or the Worldscale Association (NYC) Inc.  If Vessel is lightered at sea, the lightering site shall not constitute a 257
port or place additional to those specified in Part I (D) and the freight rate for the voyage shall be the same as if the lightering had 258
not taken place.  Charterer, however, shall reimburse Owner for any time by which the steaming time to the final discharging port 259
or place exceeds that which would have been taken if Vessel had not lightered at the Deviation Rate per day or pro rata for a part 260
thereof.  In addition, Charterer shall pay for extra bunkers consumed by Vessel during such excess time at Owner's documented 261
actual replacement cost at the port where bunkers are next taken. 262
(c)  With respect to any loading or discharging in port or at sea, Charterer may, at its option and cost, place on the Vessel one or 263
more cargo advisors to monitor the loading, lightering and/or discharge of cargo and, if applicable, the inert gas and/or crude oil 264
washing.  It is understood and agreed however, that the Master and Owner shall continue to be fully and solely responsible for the 265
operation, management and navigation of Vessel during the entire loading, lightering and/or discharging operation. 266

16.     LOADING / DISCHARGING PLACE. 267
(a)  Vessel shall not be required to berth where the maximum draft of Vessel is greater than the depth of water at low tide.  In such 268
cases, Charterer undertakes to discharge sufficient cargo into vessels and/or lighters within port limits to enable Vessel to safely 269
reach and lie at berth always afloat. 270
(b)  SAFE LOCATION(S).  Charterer shall exercise due diligence to order Vessel to port(s) or place(s) which are safe for Vessel 271
and where it can lie always safely afloat.  Notwithstanding anything contained in this or any other Clause in this Charter to the contrary, 272
Charterer shall not be deemed to warrant the safety of any such port(s) or place(s) and shall not be liable for any loss, damage, 273
injury or delay resulting from any unsafe condition at such port(s) or place(s) which could have been avoided by the exercise of 274
reasonable care on the part of the Master or Owner.  The term "safe", as used in Part I (C) and (D), shall be construed to be consistent 275
with Charterer's obligation as set forth in this Paragraph (b). 276
(c)  SHIFTING.  Charterer shall have the right to shift Vessel within any port of loading and/or discharging from one loading or discharging 277
place back to the same or to another such place once or more often.  In the event that Charterer exercises this right, Charterer 278
shall pay all additional expenses properly incurred, including additional Bunkers.  Time spent shifting shall count as laytime or, if 279
Vessel is on demurrage, as time on demurrage.  For purposes of freight payment, the places grouped in port and terminal combinations 280
in WORLDSCALE or to be considered as berths within a single port, with Charterer paying shifting expenses in accordance with 281
the foregoing. 282
(d)  OFF BERTH.  Charterer or terminal operator shall have the right to shift Vessel from a loading and/or discharging place if 283
Vessel fails to meet the pumping and/or heating warranties stipulated in Clauses 18 and 25 so as to avoid delay to other vessels 284
waiting to use such place.  Charterer or terminal operator shall also have the right to shift Vessel from a loading and/or discharging 285
place due to an unsafe condition of Vessel.  In such situation(s), Charterer shall not be obliged to provide an alternative loading or 286
discharging place to the place from which Vessel was shifted.  However, Charterer shall exercise due diligence to arrange prompt 287
reberthing and commencement of loading or discharging once Vessel has corrected deficiency(ies).  All expenses related to this 288
shifting and any reberthing shall be for Owner's account and all time lost by reason of the foregoing shall not count as laytime or, 289
if Vessel is on demurrage, as time on demurrage.  An Off Berth reference is also contained in Clause 24 (b). 290

17.     CARGO MEASUREMENT. 291
(a)  Prior to loading, Master shall measure the on board quantities of oil, water and sediment residues which are segregated in all 292
holding tanks and slop tanks and those which remain in cargo tanks and, if requested, shall advise supplier(s) and Charterer of 293
such quantities. After loading, Master shall determine the cargo quantities loaded, expressing these cargo quantities in barrels at 294
standard temperature (60°F), using for such calculations the latest Manual of Petroleum Measurement Standards issued by the 295
American Petroleum Institute (API MPMS) or similar standards issued by the American Society for Testing and Materials. A written 296
tank-by-tank ullage report containing all measurements of oil, water and sediment residues on board prior to loading and quantities 297
of cargo loaded shall be prepared and promptly submitted by Master to Charterer. 298

(b) If Master's calculations of cargo loaded (oil, water and sediment residues on board excluded), after applying the Vessel's Experience Factor (VEF), show any deficiency from the Bill of Lading figures, Master shall, if investigation and recalculation verify such deficiency, issue a Letter of Protest to supplier(s) (which should, if practical, be acknowledged) and shall advise Charterer of such deficiency immediately by electronic mail, telex or radio and thereafter shall send a copy of the Letter of Protest to Charterer. Vessel shall have on board sufficient historical information for the calculation of a VEF using the latest edition of the API MPMS. Master shall calculate and apply the VEF as so determined during all loadings.

(c) Prior to discharging, Master shall measure the quantity of each grade of cargo on board, expressing these quantities in barrels at standard temperature (60°F), using the same calculation procedures specified in Paragraph (a) of this Clause. Before and after discharging, Master shall cooperate with shore staff to ascertain discharged quantities. Vessel shall be obliged to discharge all liquid oil and, if ordered by Charterer, any residues of oil, water and sediment. Vessel's just-mentioned obligation shall not in any way be qualified or limited by any purported custom of the trade which is based on a stated in-transit loss or which otherwise would excuse Vessel from discharging all liquid cargo and residues.

(d) An inspector may be employed by Charterer at its expense to verify quantities and qualities of cargo and residues on board Vessel at both loading and discharging port(s) and/or place(s). If Vessel is equipped with an Inert Gas System, depressurization of tanks to permit ullage measurements shall be allowed in accordance with the provisions of the most recent Inert Gas Systems for Oil Tankers publication issued by the International Maritime Organization (IMO). Any time used solely for such inspections and/or measurements shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

18.  PUMPING IN AND OUT.

(a) Hoses for loading and discharging shall be furnished by Charterer and shall be connected and disconnected by Charterer or by Owner, at Charterer's option. When Vessel loads and/or discharges at sea terminal(s), Vessel shall be properly equipped, at Owner's expense, for operations at such terminal(s), including suitable anchors, ground tackle, mooring lines and equipment for handling submarine hoses. Vessel shall also be properly equipped with a sufficient number of cargo manifold reducing pieces of steel or comparable material (excluding aluminum and gray cast iron) which meet the most recent Oil Companies International Marine Forum (OCIMF) standards, to make available appropriate flanges for cargo hoses/arms at all manifold connections on one side of Vessel. If Vessel is not properly equipped as required in this Paragraph (a), any time thereby lost shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.

(b) The cargo shall be pumped into Vessel at the expense and risk of Charterer only up to Vessel's permanent hose connections. The cargo shall be discharged from Vessel at the expense and risk of Owner only up to Vessel's permanent hose connections. Vessel shall provide all necessary pumps, power, and hands required on board for mooring and unmooring, connecting and disconnecting of hoses and loading and discharging, if requested by Charterer, Vessel shall load and/or discharge more than one grade simultaneously if Vessel is technically capable of doing so.

(c) Owner warrants that Vessel shall arrive at the loading place(s) with cargo tanks properly inerted and that such tanks shall so remain inerted throughout the loading of the cargo, the voyage and the subsequent discharging of the cargo. In case of an Inert Gas System failure during loading and/or discharging, cargo operations shall be suspended immediately until the System becomes fully operational, any deficiency in inerting is fully corrected and the terminal (or other loading and/or discharging facility) has given permission to resume operations. Time used from cessation to resumption of cargo operations shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.

(d) If required by Charterer, Vessel, after discharging, shall clear shore pipelines of cargo by pumping water through them and the time thereby consumed shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(e) All overtime incurred by officers and crew in loading and/or discharging shall be for the account of Owner.

(f) Vessel shall load at rates requested by Charterer having due regard for the safety of Vessel, Owner warrants that Vessel shall discharge entire cargo (be it one or more grades) within twenty-four (24) hours pumping time or maintain 100 psi pressure at Vessel's rail during the entire period of discharge provided shore facilities permit. All time lost as a result of Vessel being unable to discharge its cargo in accordance with the pumping warranty above shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. If the terminal or place of discharging does not allow or permit Vessel to meet the above warranty or requires discharging grades consecutively, Master shall forthwith issue a Letter of Protest (which should, if practical, be acknowledged) to such terminal or place and shall immediately advise Charterer by electronic mail, telex or radio. If Master fails to issue the Letter of Protest, Owner shall be deemed to waive any rights to contest that time was lost as a result of Vessel's failure to comply with the above pumping warranty. Any pumping time lost solely due to restrictions imposed by the terminal or place of discharge shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(g) Charterer shall have the right to require Vessel, if it is so equipped, to Crude Oil Wash the cargo tanks and, in such case, the allowed pumping hours (i.e. the twenty-four (24) hours of pumping time specified in Paragraph (f) of this Clause or the number of pumping hours taken to discharge the entire cargo when Vessel maintains the applicable rail pressure in accordance with Paragraph (f) of this Clause, whichever is applicable) shall be increased by the maximum hours specified in Part I (A) for Crude Oil Wash operations. If less than all of the tanks are washed, the said maximum hours shall be prorated on the basis of the number of tanks washed to the total number of cargo tanks and the hours resulting from such proration shall be added to the allowed pumping hours. If Crude Oil Wash is not conducted, Charterer shall have the right to require Vessel to remain at berth for clingage rundown or other cargo recovery technique. The time for such clingage rundown or other cargo recovery technique shall not exceed ten (10) hours and the time so used shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(h) In the event that any liquid cargo remains on board at completion of discharge for the final voyage under this Charter, then Charterer shall have the right to deduct from freight an amount equal to the Free On Board (FOB) port of loading value of such cargo plus freight due with respect thereto. The quantity and quality of such liquid hydrocarbon material shall be determined by a mutually agreeable independent cargo inspector. The quantity of Remaining On Board (ROB) material shall be measured using the Vessel's wedge tables, if available, or otherwise by wedge formula.

19.  BACK LOADING. Charterer shall have the option of loading Vessel with a part cargo at any discharging port or place to which Vessel may have been ordered, provided that such part cargo is as described in Part I (F) and is compatible with cargo then on board. Owner shall discharge such part cargo at any other discharging port(s) or place(s) previously nominated, provided such port(s) or place(s) lie within the rotation of the discharging ports or places previously nominated. If this option is exercised, additional time consumed awaiting berth and/or cargo and/or tank preparation and/or loading and discharging such part cargo shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Any additional expenses, including port charges, incurred as sole result of loading and discharging such part cargo shall be for Charterer's account.

20.  DUES, TAXES AND OTHER CHARGES.

(a) Unless otherwise specified in WORLDSCALE and to the extent not prohibited by law, dues, taxes and other charges upon Vessel (including those assessed on the quantity of cargo loaded or discharged or on the freight) shall be paid by Owner and dues, taxes and other charges on the cargo shall be paid by Charterer. Vessel shall be free of charges for the use of any place(s)

arranged by Charterer solely for the purpose of loading or discharging cargo. However, Owner shall be responsible for charges for any such place(s) when used solely for Vessel's purposes, such as, but not limited to, awaiting Owner's orders, tank cleaning, repairs, before, during or after loading and/or discharging.
(b) Notwithstanding the provisions of Clause 20(a), dockage and wharfage shall be deemed included in the freight rate specified in Part I (G).

21. ICE.
(a) DURING VOYAGE. In case a nominated port or place of loading or discharging should be inaccessible due to ice, Master shall immediately notify Charterer by electronic mail, telex or radio, requesting revised orders and shall remain safely outside the ice-bound area. Charterer shall give orders for another port or place which is free from ice and where there are facilities for the loading or discharging of the cargo in bulk. In this event, freight shall be paid at the rate stipulated in Part I (G) from or to such alternate port or place and any time by which the steaming time from or to such port or place exceeds that which would have been taken if the Vessel had been ordered to proceed from or to such port or place in the first instance shall be compensated at the Deviation Rate per running day and pro rata thereof. In addition, Charterer shall pay for extra bunkers consumed during such excess time at Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken.
(b) AT PORT. If, on or after Vessel's arrival at the loading or discharging port or place, it is dangerous to remain at such port or place for fear of Vessel being frozen-in or damaged, Master shall notify Charterer who shall give orders for Vessel either to proceed to another port or place where there is no danger of ice and where there are facilities for the loading or discharging of the cargo in bulk or to remain at such original port or place at Charterer's risk. If Vessel is ordered to proceed to another port or place, the sum in respect of freight and delay to be paid by Charterer shall be as stipulated in Paragraph (a) of this Clause. If Vessel remains at such original port or place, any time so lost on account of ice shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

22. DRY CARGO. Charterer has the option of shipping packaged and/or general cargo (including oils and bitumen in drums) in the available dry cargo space. Freight shall be payable on such cargo in accordance with Clause 6 at the Base Freight Rate and Charterer shall pay, in addition, all expenses, including port dues, incurred solely as a result of the packaged and/or general cargo being carried. The time used loading and discharging such dry cargo shall count as laytime or, if Vessel is on demurrage, as time on demurrage, but only to the extent that such time is not concurrent with time used loading and/or discharging the oil cargo.

23. QUARANTINE. Time lost at any port or place due to quarantine shall not count as laytime or, if Vessel is on demurrage, as time on demurrage unless such quarantine is in force at the time when such port or place was nominated by Charterer.

24. INSPECTION.
(a) OPERATIONS. Charterer's representative(s) shall have the right at loading and/or discharging port(s) or place(s) to inspect Vessel and observe operations. Owner shall instruct Master to give every assistance so as to enable said representative(s) to properly observe operations throughout Vessel.
(b) BUNKER SAMPLING. Charterer's representative(s) shall have the right to survey and take samples of all Vessel's bunker tanks and non-cargo spaces. Refusal by Master to permit such bunker surveying and sampling shall give Charterer or terminal operator the right to order Vessel off berth. All time lost by reason of such refusal, including any time used in shifting Vessel off and back to berth, shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Further, all expenses related to such refusal, including Vessel shifting expenses, shall be for Owner's account. Any delay to Vessel caused solely by bunker surveying and sampling shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

25. HEAT. If Vessel is described as coiled in Part I (A), Owner warrants that Vessel is capable of heating the cargo up to and maintaining it at a maximum temperature of 135°F/57°C. However, unless otherwise requested by Charterer, Vessel shall only be required to maintain the cargo at the temperature loaded (up to a maximum of 135°F/57°C) throughout the voyage and the entire discharge. If requested by Charterer and if the length of the voyage allows, Vessel shall increase and maintain the temperature of the cargo from the loaded temperature to a temperature specified by Charterer, up to a maximum of 135°F/57°C, and Charterer shall pay for extra bunkers consumed solely in increasing the temperature as aforesaid at Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken. If Vessel fails to maintain the loaded temperature or to increase and maintain the temperature of the cargo, as requested by Charterer, Charterer shall have the option to hold Vessel off berth and/or to suspend discharging, all until the cargo is properly heated, all time and expense in connection with the foregoing being for Owner's account.

26. BUNKERS. When, in connection with the performance of any voyage provided for in this Charter, Owner is required to purchase bunkers at any port(s) outside the United States or its territories, Owner shall purchase the bunkers from Charterer or its designated Affiliate(s) whenever they are so available at competitive prices. In the event lower prices are quoted to Owner by any supplier at the port(s) in question, Owner shall give Charterer or its designated Affiliate(s) the opportunity to meet such quotation.

27. BILLS OF LADING.
(a) Bills of Lading shall be signed by Master as presented, Master attending daily, if required, at the offices of Charterer or its agents. However, at Charterer's option, Charterer or its agents may sign Bills of Lading on behalf of Master. All Bills of Lading shall be without prejudice to this Charter and Charterer shall indemnify Owner against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bills of Lading or other documents signed by Charterer or its agents or by Master at their request or which may arise from an irregularity in papers supplied by Charterer or its agents.
(b) Notwithstanding anything in this Charter to the contrary, the carriage of cargo under this Charter and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vi) of this Clause and such terms shall be incorporated verbatim or be deemed incorporated by reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "Carrier" shall include Owner and Chartered Owner of Vessel.

(i)  CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods By Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii)  JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated

by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo shippers, consignees or owners of the cargo to the Carrier before delivery.

    (iii)  **GENERAL AVERAGE.** General Average shall be adjusted, stated, and settled according to the York Antwerp Rules 1994 ("Rules") and, as to matters not provided for by those Rules, according to the laws and usages at the port of New York; provided that, when there is an actual escape or release of oil or pollutant substances from the Vessel (irrespective of Vessel location), the cost of any measures, continued or undertaken on that account, to prevent or minimize pollution or environmental damage shall not be allowable in General Average; and, provided further, that any payment for pollution damage (as defined in Article I 6.(a) of the 1992 Protocol to the International Convention on Civil Liability for Oil Pollution Damage) shall also not be allowable in General Average. It is understood and agreed, however, that the cost of measures to prevent pollution or environmental damage, undertaken in respect of oil or pollutant substances which have not escaped or been released from the Vessel, shall be included in General Average to the extent permitted by the Rules. If a General Average statement is required, it shall be prepared at such port by an Adjuster from the port of New York appointed by the Carrier and approved by Charterer of Vessel. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Carrier and/or Charterer, and/or Owner, and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by the Adjuster at the Adjuster's risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

    (iv)  **BOTH TO BLAME.** If Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of Vessel, the owners of the cargo carried hereunder shall indemnify the Carrier against all loss or liability to the other or non-carrying ship or its owners insofar as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or its owners as part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

    (v)  **LIMITATION OF LIABILITY.** Any provision of this Charter to the contrary notwithstanding, the Carrier shall have the benefit of all limitations of, and exemptions from, liability accorded to owner or chartered owner of vessels by any statute or rule of law for the time being in effect.

    (vi)  **DEVIATION.** Vessel shall have liberty to sail with or without pilots, to tow or be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage.

(c)  Except as provided in Paragraph (d) of this Clause, Owner and Vessel shall not be required to deliver cargo at a discharging port or place nominated by Charterer unless the party claiming right to such delivery shall first surrender to Vessel at such port or place one of the original Bills of Lading issued for the cargo, duly endorsed; provided however that, if the Bills of Lading name specific port(s) or place(s) of discharging and the nominated port or place is different or if the Bills of Lading provide for discharge at port(s) or place(s) as ordered, Owner and Vessel shall not be required to deliver the cargo unless the party claiming right to such delivery first surrenders to Vessel all the original Bills of Lading, duly endorsed. The foregoing shall apply even in the situation where one but not all of the original Bills of Lading have been placed on board Vessel at loading but, in such case, only the original Bill(s) of Lading not on board Vessel need first to be surrendered to Vessel in accordance with the foregoing requirements. Any delay to Vessel at the nominated port or place due to the unavailability at such port or place of original Bill(s) of Lading and/or the failure to timely surrender such Bill(s) of Lading to Vessel in accordance with the foregoing requirements shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(d)  If original Bill(s) of Lading are not available at the discharging port or place for timely surrender to Vessel as provided in Paragraph (c) of this Clause, Vessel shall deliver the cargo to a party and at a facility at the discharging port or place as directed by Charterer in writing by letter, telex, electronic mail or facsimile, if Charterer first executes a written indemnity in connection with such delivery in favor of Owner, Vessel, any Chartered Owner(s) of Vessel, Master, Vessel operators, agents and underwriters and delivers such indemnity to Owner or Owner's designee. The subject indemnity shall meet the requirements of Paragraph (e) of this Clause.

(e)  The indemnity referred to in Paragraph (d) of this Clause shall be a short form indemnity document incorporating the terms and conditions set forth in Clause 27(f) of this Charter. This document (which must be properly filled in) shall be given to Owner by telex, electronic mail, letter or facsimile as requested by Owner and be in the exact form quoted below, which document, when transmitted, shall be deemed to have been signed by person acting on behalf of Charterer.

```
"VOYAGE CHARTER OF

DATED _____  _____

BETWEEN _____, AS OWNER
                    AND
        _____, AS CHARTERER
```

Reference is made to the cargo ('Cargo') now laden aboard the above Vessel ('Vessel'). Pursuant to Clause 27(e) of the above captioned Charter ('Charter'), the undersigned requests that Owner(s) of the Vessel deliver the Cargo at _____ unto _____ without prior discharge site presentation to the Vessel of all original bills of lading issued for the Cargo appropriately endorsed for such delivery and/or at a discharge port or site other than one specifically named in said bills of lading.

In consideration of such delivery, the undersigned hereby gives an indemnity containing the terms and conditions set forth in Clause 27(f) of the Charter (collectively 'Indemnity Terms And Conditions'). The Indemnity Terms And Conditions are deemed incorporated in and made a part of this document. The term 'Indemnifier' in the Indemnity Terms And Conditions shall be deemed to refer to the undersigned. The term 'Cargo' and the phrase 'Requested Delivery' in the Indemnity Terms And Conditions shall be deemed to, respectively, mean the Cargo and the delivery request set forth in the preceding paragraph of this document. The term "Ship" as used in the Indemnity Terms And Conditions shall be deemed to refer to the Vessel. Print the following information:

Name of Charterer _____  524

Name of Person Acting on Behalf of Charterer ____ _____  525
                                                                                526
Authority/Title of Above Person _____  527
                                                                                528
Date Indemnity Given _____  529
                                                                                530
                                                                                531

(f) Indemnity Terms and Conditions.  532
"1.   Indemnifier shall indemnify and hold harmless the Owner of the Ship, any chartered Owner of the Ship, the Ship operator, the  533
Ship Master, the Ship underwriters and the Ship agents (hereinafter jointly and individually called "Indemnitees") in respect of any  534
liability, loss, damage, costs (including, but not limited, to Attorney/Client costs) and other expense of whatever nature which the  535
Indemnitees may sustain or incur by reason of the Requested Delivery.  536
2.   In the event of any legal action or proceedings commenced against the Indemnitees in connection with the Requested  537
Delivery, Indemnifier shall provide Indemnitees from time to time, on the Indemnitees' demand, with sufficient funds to defend  538
same.  539
3.   If the Ship or any other vessel or other property belonging to the Indemnitees should be arrested or detained or if the arrest  540
or detention thereof should be threatened for any claim in connection with the Requested Delivery, the Indemnifier shall provide,  541
upon demand of the Indemnitees, such bail or other security as may be required to prevent such arrest(s) or detention(s) or to  542
secure the release of the Ship or such vessel or other property from arrest or detention, and shall indemnify and hold harmless  543
the Indemnitees against and from any loss, damage, costs (including but not limited to Attorney/Client costs) and other expense  544
resulting from such arrest or detention or threatened arrest or detention, whether or not same may be justified and to pay to the  545
Indemnitees, on the Indemnitees' demand, the amount of such loss, damages, costs and/or expense.  546
4.   This Indemnity shall automatically become null and void, and Charterer's liability hereunder shall cease, upon presentation of  547
all original Bills of Lading duly endorsed to reflect delivery of Cargo in accordance with the Requested Delivery, or upon the  548
expiration of 36 months after completion of discharge, whichever occurs first; provided that no legal proceedings arising from  549
delivery of the Cargo in accordance with the Requested Delivery have been instituted against the Indemnitees and/or Vessel within  550
such 36-month period. Owner shall advise Charterer with reasonable dispatch in writing if any proceedings are instituted.  551
5.   The within Indemnity shall be governed and construed in accordance with the internal substantive laws of the State of New York,  552
USA.  The Indemnitees may, but shall not be obligated to, bring any legal action or proceeding with respect to such Indemnity in the  553
Courts of the State of New York, USA or in the U.S. Federal Court situated therein and the Indemnifier unconditionally and generally  554
accepts in regard to such legal action or proceeding, for itself and its property, the jurisdiction and venue of the aforesaid courts."  555

28.    WAR.  556
(a)  No contraband of war shall be shipped, but petroleum and/or its products shall not be deemed contraband of war for the purposes  557
of this Clause. Vessel shall not, however, be required, without the consent of Owner, which shall not be unreasonably withheld, to  558
enter any port, place, or zone which is involved in a state of war, warlike operations or hostilities, civil strife or piracy, whether there  559
be a declaration of war or not, where it might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act  560
by a belligerent power (the term "power" meaning any de jure or de facto authority or any other purported governmental organization  561
maintaining naval, military or air forces).  562
(b)  For the purposes of this Clause, it shall be unreasonable for Owner to withhold consent to any voyage, route, or port or place  563
of loading or discharging if insurance against all risks defined in Paragraph (a) of this Clause is then available commercially or  564
under a government program in respect of such voyage, route or port/place of loading or discharging. If such consent is given by  565
Owner, Charterer shall pay any provable additional cost of insuring Vessel against Hull war risks over and above such costs in  566
effect on the date of this Charter in an amount equal to the insured value stipulated in its ordinary marine policy as of the date of  567
this Charter. If such insurance is not obtainable commercially or through a government program, Vessel shall not be required to  568
enter or remain at any such port, place or zone and, in such case, Charterer shall have the right to order Vessel to load or discharge,  569
as the case may be, at any other port(s) or place(s) consistent with Part I (C) and (D).  570
(c)  In the event of the existence of the conditions described in Paragraph (a) of this Clause subsequent to the date of this Charter,  571
Charterer shall, in respect of a voyage to any such port, place or zone, assume any provable additional cost of wages and insurance  572
property incurred in connection with Master, officers and crew as a consequence of such war, warlike operations or hostilities over  573
and above such costs in effect on the date of this Charter.  574

29.    EXCEPTIONS.  575
(a)  Vessel, Master and Owner shall not, unless otherwise expressly provided in this Charter, be responsible for any loss or damage  576
to cargo arising or resulting from: any act, neglect, default or barratry of Master, pilots, mariners or other servants of Owner in the  577
navigation or management of Vessel; fire, unless caused by the personal design or neglect of Owner; collision, stranding, or peril,  578
danger or accident of the sea or other navigable waters; or from explosion, bursting of boilers, breakage of shafts, or any latent  579
defect in hull, equipment or machinery. Neither Vessel, Master or Owner, nor Charterer, shall, unless otherwise expressly provided  580
in this Charter, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from: act of  581
God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people,  582
or seizure under legal process provided bond is promptly furnished to release Vessel or cargo; strike or lockout or stoppage or  583
restraint of labor from whatever cause, either partial or general; or riot or civil commotion.  584
(b)  The exceptions stated in Paragraph (a) of this Clause shall not affect Owner's warranties and undertakings herein with respect  585
to the condition of Vessel, the obligations of Owner in respect of the loading, handling, stowage, carriage, custody, care and discharge  586
of the cargo and/or the rights or obligations of either Owner or Charterer with respect to laytime or demurrage as elsewhere provided  587
in this Charter.  588

30.    LIEN.  Owner shall have a lien on all cargoes and subfreights for all amounts due under this Charter, and Charterer shall have a  589
lien on Vessel for all monies paid in advance and not earned, and all disbursements for Owner's account, including commissions,  590
cost of insurance and expenses thereon and for any damages sustained by Charterer as a result of the breach of this Charter by  591
Owner.  592

31.    AGENTS.  Unless otherwise agreed, Charterer shall nominate Vessel's agents at all port(s) and place(s). Such agents shall be  593
appointed, instructed and paid for by Owner. Owner shall have the right, at its expense, to appoint and instruct protecting agents  594
at all port(s) and place(s).  595

32.    ASSIGNMENT / SUBLET.  Charterer shall have the option of assigning this Charter or of subletting Vessel, but in either case,  596
Charterer shall always remain responsible for the due fulfillment of this Charter in all terms and conditions.  597

33.  CLEAN SEAS.

(a) HANDLING OF TANK WASHINGS. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such Program requires compliance with latest IMO and Port State regulations. The Program prohibits discharge overboard of all oil and all oily water, oily ballast or oil in any form unless in compliance with IMO and Port State local regulations or under extreme circumstances whereby the safety of Vessel, cargo or life at sea would be imperiled. Owner shall ensure that Vessel's personnel comply with the following:

(i)  Subsequent to the date of this Charter and in the course of the ballast passage before presenting for loading hereunder, any oily residues remaining in Vessel from its previous cargoes shall be retained on board and shall be handled according to Charterer's instructions.

(ii)  During tank washing, the tank washings shall be collected into one cargo compartment and, after maximum separation of free water, such free water shall be discharged overboard to the extent permitted by applicable international regulations.

(iii)  Thereafter, Charterer shall be notified promptly by electronic mail, telex or radio of the estimated quantity of the segregated tank washings and any other oily residues on board. If Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by Owner and paid for by Charterer. Any additional Canal dues incurred on the ballast passage by reason of Vessel having tank washings on board shall be for the sole account of Owner. Owner shall ensure that Master, on Vessel's arrival at the loading port(s) or place(s), does the following:

• arranges for the measurement of the segregated tank washings in conjunction with the cargo supplier(s);
• records the quantity of tank washings so measured in Vessel's ullage record;
• issues a Slop Certificate; and
• arranges that the Slop Certificate and/or Vessel's ullage record be duly signed by the cargo supplier(s) and promptly sent to Charterer.

The segregated tank washings and any other oily residues on board (hereinafter called "residues") shall, at Charterer's option, be pumped ashore into slop facilities at the loading port(s) or place(s), commingled with the cargo to be loaded or segregated from the cargo to be loaded.

If Charterer requires Master to discharge the residues at facilities at loading port(s) or place(s), no freight shall be payable on same but the time involved in accomplishing such discharge shall count as laytime or, if Vessel is on demurrage, as time on demurrage, including, but not limited to, waiting for availability of, or for berthing at, the slop receiving facility and shifting to and from such facility. Further, the cost of such facilities and the ultimate disposal of the residues shall be for Charterer's sole account. If Charterer requires residues to be kept separate from the cargo to be loaded, same shall, at Charterer's option, be discharged at the discharging port(s) or place(s) in accordance with Charterer's instructions.

If Charterer requires that the cargo be loaded on top of residues or that such residues be kept separate from the cargo to be loaded, in either case freight shall be payable in accordance with Clause 6 on the quantity of residues at the Overage Rate, if such rate exists, or otherwise at the Base Freight Rate, up to a maximum tonnage equivalent to one percent (1.0%) of Vessel's deadweight as specified in Part I (A), with the exception that, in the case of a Part Cargo Minimum, no freight shall be paid if the residues are kept separate and not discharged. In no event shall Charterer hold any liability for deadfreight in connection with residues, except where the Vessel is ordered to load a full cargo and is required to keep residues segregated, in which case deadfreight shall be due. Nothing in Charterer's instruction shall be construed as permission to contravene any applicable laws or regulations by the discharging of oily residues.

(b) CLEAN BALLAST. Owner warrants that Vessel will arrive at load port(s) with clean ballast.

(c) ITOPF. Owner warrants that it is a Member of the International Tanker Owners Pollution Federation ("ITOPF") and that Owner will retain such membership during the entire period of the services of the Vessel under this Charter.

34.  DRUG AND ALCOHOL POLICY. Owner warrants that it has a policy on Drug and Alcohol Abuse ("Policy") applicable to the Vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines For the Control of Drugs and Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all Vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations. Owner further warrants that the Policy will remain in effect during the term of this Charter and that Owner shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence.

35.  ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York, pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by Owner, one by Charterer and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on the other party to specify further disputes or differences under this Charter for hearing and determination. The arbitrators may grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance. Awards made in pursuance to this Clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

36.  WAIVER OF CLAIMS. Any claim for freight, deadfreight, demurrage and/or charges or expenses under this Charter shall be deemed waived, extinguished and absolutely barred if such claim is not received by Charterer or Owner, as the case may be, in writing with supporting documentation within 90 days from the date of final discharge of the cargo on the voyage with respect to which said claim arises. This Clause shall not apply with respect to claims for damage, loss or shortage of cargo.

37.  BUSINESS POLICY. Owner agrees to comply with all laws and lawful regulations applicable to any activities carried out in the name, or otherwise on behalf, of Charterer under the provisions of this Charter. Owner agrees that all financial settlements, billings and reports rendered by Owner to Charterer, as provided for in this Charter, shall, in reasonable detail, accurately and fairly reflect the facts about all activities and transactions handled for the account of Charterer.

38.  INTERPRETATION. The interpretation of this Charter and the rights and obligations of the parties thereto shall be governed by the laws applicable to charter parties made in the City of New York. The heading of Clauses and Paragraphs are for convenience of reference only and shall not affect the interpretation of this Charter. No modification, waiver or discharge of any term of this Charter shall be valid unless in writing and signed by the party to be charged therewith. Notwithstanding anything in this Charter to the contrary, this Charter shall not be interpreted or applied so as to require Owner or Charterer to do, or to refrain from doing, anything which would constitute a violation of, or result in a loss of economic benefit under, United States anti-boycott laws and regulations.

**TESORO FAR EAST MARITIME COMPANY & GOLD STAR MARITIME COMPANY
TANKER CHARTERING CLAUSES**

(A)      Charterer's full style: Tesoro Far East / Gold Star Maritime Company or its nominees

(B)      Charter party form:      ExxonMobil Voy 2000, terms and conditions to apply with following amendments / additions:

**EXXONMOBIL VOY 2000 PART II**

| | |
|---|---|
| Clause 3 (b) | Delete |
| Clause 4 | Delete the word telex from line 54 and add email and/or facsimile. |

Clause 13 (c)      Delete after "effected" from line 174 to 176 and add "; provided always that if the Vessel is detained solely for the purposes of awaiting cargo documents at loadport for more than three (3) hours beyond the final disconnection of cargo hoses, laytime or, if the Vessel is on demurrage, demurrage, shall recommence after such period of three (3) hours and terminate upon the completion of cargo documentation.   If, after completion of loading or discharging, the Vessel is required to proceed to an anchorage for Charterers' purposes, then the time spend moving from the berth to the anchorage shall not count as part of the three (3) hours referred to above or, as laytime, or, if the Vessel is on demurrage, as demurrage.

Clause 18 (d)      Line 336, after "Vessel", insert "before loading or", after "pipelines" insert "or floating hoses" after "water", insert "or CPP supplied by terminal"
Line 337; add at the end, "Owner shall not be held responsible for the discoloration or any other consequences related to this particular operation.

Clause 18 (h)      Line 360, after "determined by" delete "mutually agreeable" and add "the receiver's currently employed independent inspector."

Clause 23      Delete all from line 400 to line 401.

Clause 25      Line 418, after "next taken" add If the cargo for the respective Charter Party is a no heat cargo as described in Part 1(f) of ExxonVoy2000, the Charterer shall have the option to increase the cargo temperature up to 135 Degrees F. Charterer shall pay for the additional bunkers consumed solely due to the increase in temperature as aforesaid.  The pricing for the additional bunkers shall be at the Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken.

Clause 26      Delete all from line 422 to line 424.

Clause 27 (c)      Delete all from line 480 to line 490.

Clause 33 (c)      Delete all

**1.      Privacy**
All negotiations and details of this fixture shall be kept strictly private and confidential and not reportable.

**2.**   **Additional Cargo Insurance**

Additional insurance on freight and/or cargo, if any, due to vessel's age, classification and/or flag shall be for Owner's account and Charterer shall have the right to deduct the cost of such additional insurance from freight due Owner.

**3.**   **Address Commission**

A commission of 1.25% on all monies earned under this charter party shall be payable to Charterer, its affiliates or assignee and is deductible from payment(s) of said monies.

**4.**   **Sea Terminal / SPM Mooring Clause**

Owner warrants that:

a)   The vessel is fully fitted with properly functioning mooring gear and other equipment as specified in the latest edition of the OCIMF "Recommendations for Equipment Employed in the Mooring of Ships at Single Point Moorings", and that the vessel will maintain such gear and equipment in proper working order while in service to Charterer under this charter party.

b)   The vessel will fully comply with and follow the operational procedures as outlined in the latest edition of the OCIMF "Single Point Mooring & Operations Guide", and will fully comply with and follow the latest edition of the OCIMF/ ICS publication "International Safety Guide for Oil Tankers and Terminals".

c)   At all times while the vessel is berthed at a sea terminal or SPM, its main engines, steering machinery and its necessary equipment shall be maintained in a condition to allow immediate maneuvering of the vessel.

d)   The vessel will fully comply with all applicable international and national, including U.S. Coast Guard, requirements, regulations and procedures including but not limited to the maintenance of a qualified live bridge watch and a bow watch at all times while the vessel is at a sea terminal or SPM.

**5.**   **Mooring Master Clause**

Owner will use the Charterer's nominated Mooring Master, at Owner's expense, to advise in mooring, connecting of hoses, discharging, loading, unmooring, and departing from offshore moorings and sea berths. However, at all times, Master of vessel remains solely responsible for vessel's safety during these operations. Mooring Master is supplied upon condition that in performance of any services rendered to Owner's vessel, he is servant of the vessel and its subsidiaries (vessel and Owner to indemnify and hold the Charterer and Charterer's affiliates and subsidiaries harmless from any liability, loss, claim or damages arising out of Mooring Master's rendering of services to vessel). Presence of Mooring Master on board in no way relieves Master of vessel of any legal responsibilities; and final decisions remain within the sound discretion of the Master.   Owner shall, at Owner's expense, accommodate each Mooring Master with a clean Officer Class cabin during the duration of the Mooring Master's stay on board the vessel.   Owner shall, at Owner's expense, furnish Officer Class meals for Mooring Masters, vessel agents, inspectors, or any other Charterer representatives that may be on board vessel for business purposes.

**6.**   **Voyage Orders**

All voyage orders pertaining to this Charter Party will emanate from the Charterer unless expressly stated otherwise by Charterer. Owner shall be fully responsible for any and all time, costs, delays or losses suffered by Charterer due to Owner's failure to comply fully with Charterer's voyage instructions, including, but not limited to, vessel's failure to comply with Charterer's instructions concerning the vessel loading cargo quantity in excess of voyage orders.

Furthermore, Charterer shall not be responsible for any dead freight due to vessel's failure to lift the minimum quantity specified in Charterer's voyage orders. Terminal orders shall not supersede Charterer's voyage instructions.

7. **In Transit Loss**

In addition to any other rights that Charterer may have, Owner shall be responsible for the full amount of any in-transit loss if the in-transit loss of cargo is in excess of 0. 30% and Charterer shall have the right to deduct an amount equal to the FOB port of loading cost of such missing cargo plus its *pro rata* cost of freight and insurance.

In-transit loss is defined as the difference between Gross Standard Volume measured on board the vessel (a) after loading at the loading port(s) and, (b) before unloading at the discharge port(s). Cargo quantities shall be determined by an independent inspector and the quantities so determined shall be conclusive.

Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

8. **Bunker Clause**

a)   Prior to the time of fixing, Owner will identify time and place of intended bunkering. Unless with the prior express written permission of the Charterer, vessel will sail from every port with enough bunkers to reach the next scheduled port, or if proceeding for orders, then to reach the furthest port to which it could be ordered, and will not stop en route or deviate for the purpose of taking on additional bunkers.

b)   In connection with the performance of the voyage in this Charter, if Owner plans to purchase bunkers at in any port(s) Owner shall purchase the bunkers from Charterer or Charterer may also designate its associates or Affiliates to supply the bunkers. Bunkers shall be priced competitively and in the event lower prices are quoted to Owner by any supplier at the port(s) in question, Charterer or its designee shall have the opportunity to meet such quotation.  Owner agrees that payment for the purchase of such bunkers may be deducted from the freight paid under this Charter Party at the option of the Charterer.

c)   If at anytime the Owner decides that bunkering at the load/discharge port is required prior to load/discharge of the cargo, Charterer to be informed immediately. All time for such operation shall not be counted as laytime. For the purpose of this bunkering operation, laytime shall cease from all fast to cast off if bunkering by barge and laytime shall cease from hose on to hose off if at berth or offshore facility.

9. **Carbon Black Cleaning Clause**

For the carriage of Carbon Black Feedstock, tanks to be cleaned to the satisfaction of Charterer's inspector and any tanks that have contained salt-water ballast during the voyage to the loadport must be fresh water rinsed and stripped dry. All pipes, pumps and lines used for handling salt water must be flushed with fresh water and lines drained before commencement of loading. Also, all excess water, bottom sediments and residues of previous cargoes must be removed from vessel's tanks prior to loading. All sea suctions and other overboard valves connected to the cargo systems must be sealed before and during loading.

10. **Demurrage / Expense**

It is understood and agreed that the phrase "in writing with supporting documents" in Clause 36 shall be taken to mean a written invoice for the claimed amount together with copies of any and all relevant documents including but not limited to ETA notices sent in compliance with Charterer's voyage orders, Letters of Protest, Notices of Readiness at each port and berth, hourly pumping logs, port logs/Statements of Facts for each port and berth, any and all documents countersigned by the supplier, shipper and/or receiver where obtainable as the case may be, or Letter of Protest where such countersignature was not obtainable. Any demurrage claim which

Owner may have under this Charter Party shall be waived and absolutely barred if the invoice for the claim and all supporting documents are not received by Charterer before the time bar.

11. **Sample and Survey**
   a)  At the end of Clause 24 of ExxonMobil Voy 2000 Section (a) add: "However, such right, and the exercise or non-exercise thereof, shall in no way reduce master's or Owner's authority over or responsibility to Charterer and third parties for the vessel and every aspect of her operation; and shall not be deemed to be, nor construed as, a waiver or acceptance of any default on the part of the vessel or Owner".

   b)  Charterer shall have the option to order the vessel to deviate at any time after leaving any port or place of loading and to make an unscheduled call at or off a port or ports for purposes of sampling cargo. Any delay arising from Charterer's requiring the vessel to deviate as aforesaid shall count as laytime, or if the vessels is on demurrage, as demurrage. Charterer shall pay Owner for additional bunkers consumed during the period of deviation at the replacement price as paid by Owner at the port where vessel next bunkers, substantiated by copies of such documents as Charterer may require, and shall reimburse Owner for port expenses, if any, at the unscheduled port(s).

12. **ITF**
   Owner guarantees that the minimum terms and conditions for employment of the crew of the vessel are now or will be prior to presentation of the vessel for loading and will remain for the period of this Charter Party, covered by an ITF Agreement or a bona fide Trade Union Agreement acceptable to the ITF.

   If berthing, loading or discharging of the vessel is prevented or delayed by, or as a consequence of any industrial dispute arising directly or indirectly from the terms and conditions of employment of the crew, any time lost by reason thereof shall not count during the continuance of such prevention or delay and the Owner shall reimburse the Charterer and/or Shipper for any expense whatsoever caused thereby.

13. **Cargo Transfer**
   At no time during the voyage shall cargo be transferred between vessel's tanks without the express consent of Charterer. Such consent shall be requested by written means of fax or electronic mail specifying loaded and revised ullage and cargo quantities for tanks concerned and reasons necessitating a cargo transfer, consent of the Charterer shall not be unreasonably withheld and shall be provided expeditiously by electronic mail, fax, telex or cable. Master to confirm to Charterer that the operation has been carried out.

   In the event transfer of cargo is unavoidable for emergency reasons involving risk to vessel's structural integrity or safety of life or for safe navigation, the prior consent of Charterer shall not be required, however, the master shall inform Charterer of any such circumstance as soon as possible thereafter by fax or electronic mail.

   It is expressly understood that in all circumstances the Master shall remain responsible for any claims that may arise due to such transfer.

14. **U.S. Customs Compliance/AMS**
   Owner warrants that it is in compliance with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:
   i)    Possess a SCAC (Standard Carrier Alpha Code);
   ii)   Possess an ICB (International Carrier Bond); and
   iii)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs.

Charterer shall provide all necessary information to the Owners and/or their agents to enable the Owners to submit a timely and accurate cargo declaration.

Charterer shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterer's failure to comply with any of the provisions of this sub-clause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or, if the Vessel is already on demurrage, time on demurrage.

Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterer against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is already on demurrage, time on demurrage.

The assumption of the role of carrier by the Owners pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

15.  **FPSO CLAUSE**
     a)   Notice of Readiness to be tendered when vessel is three nautical miles off of FPSO. If vessel is unable to tender Notice of Readiness before 1500 hours local time and the berthing master is unable to moor off tanker vessel due to proximity of hours of darkness then time spent waiting to moor until 0700 hours local time the subsequent day, or until vessel is fully moored and hoses connected, whichever occurs first, shall not count as used laytime, or demurrage, if vessel is on demurrage.

     b)   At FPSO, Notice of Readiness to be tendered when the vessel is at the port of Dampier or designated area. If vessel is unable to moor before 1500 hours local time and the berthing master is unable to moor off tanker vessel due to proximity of hours of darkness then time spent waiting to moor until 0700 hours local time the subsequent day, or until vessel is fully moored and hoses connected, whichever occurs first, shall not count as used laytime, or demurrage, if vessel is on demurrage.

     c)   At FPSONW Australia, all cost for embarking /disembarking mooring master, agents and etc at Port of Dampier or designated area have been included in lump sum freight. All time for shifting to FPSO and back to disembark shore personnel shall not count as laytime or demurrage if vessel is on demurrage.

16.  **Notices**
     After the Charter Party is fixed the Owner shall keep the Charterer informed every day on the detailed itinerary of the vessel including ETA at the first loadport. These instructions apply up to the time the vessel sails from the last port on the previous voyage to the nominated loadport on this voyage, after which Clause 10, "ETA" of the Charter Party will be applicable.

17.  **Oceanroutes**
     The vessel's daily position and speed may, at Charterer's option, be monitored by a weather routing company ("Oceanroutes") for Charterer's arrangement and account for tracking purposes only. The vessel will transmit daily positions directly to the weather routing company as detailed in the voyage orders.

Far East Maritime Company & Gold Star Maritime Company

18.     **BIMCO Standard ISM Clause**
        From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter party, the Owner shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owner shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterer.

        Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owner or "the Company" to comply with the ISM Code shall be for the Owner's account.

19.     **Alaska Clause**
        a)      Owner warrants that vessel will have a minimum of 12 wires with polyester tails on drums to be used for mooring at KPL dock at Nikiski. If vessel does not have polyester tails onboard, owners to arrange with the agents to rent them before vessel arrives at berth. All cost for rental & time to change the tails/wire will be at owners account.

        b)      Owner will be included on Charterer's Cook Inlet response plan at Charterer's expense for any call at Alaska.

        c)      If requested by Charterer, after departing the last port while enroute to ports in Alaska, vessel to transfer the remaining oil onboard to the remaining cargo tanks onboard such that the oil level in the tank is always below the water level (hydrostatic loading) all time and cost for the operations are for owners account.

        d)      Owner shall supply Charterer copies of various documents/plan (as per attachment) by courier as soon as possible, but always with 5 days after subjects lifted for this charter.

        e)      Charterer's nominated agents will be utilized for all Alaskan port calls.

20.     **Hydrogen Sulphide (H2S)**
        Owner shall comply with the requirements in ISGOTT (as amended from time to time) concerning Hydrogen Sulphide and ensuring that the Hydrogen Sulphide level is always below the threshold limit value (TLV).

        If on arrival at the loading terminal, the loading authorities, inspectors or other authorized and qualified personnel declare that the Hydrogen Sulphide levels exceed the TLC and request the vessel to reduce the said level to within the TLV then the Original Notice of Readiness (NOR) shall not be valid. A valid NOR can only be tendered and laytime, or demurrage time, if on demurrage, start to run in accordance with Clause 13 (as amended) of ExxonMobil Voy 2000 when the TLV is acceptable to the relevant authorities.

        All time, costs and expense as a result of Owner's failure to comply with the foregoing shall be for Owner's account.

        If the vessel is unable to reduce the levels of Hydrogen Sulphide within a reasonable time Charterer shall have the option of canceling this Charter Party without penalty and without prejudice to any claims which Charterer may have against Owner under this Charter.

21.     **Part Cargo (Demurrage)**
        If any part cargo for other charterers, shippers or consignees (as the case may be) is loaded or discharged at the same berth, then any time used by the vessel waiting at or for such berth and in loading or discharging which would otherwise count as laytime or if the vessel is on demurrage for demurrage shall be pro-rated in the proportion that charterer's cargo bears to the total cargo to

be loaded or discharged at such berth. If however, the running of laytime or demurrage, if on demurrage, is solely attributable to other parties' cargo operations then such time shall not count in calculating laytime or demurrage, if on demurrage, against Charterer under this Charter.

**22.** **Clearance**

If Owner fails:

a) to obtain Customs clearance; and/or
b) free pratique (quarantine); and/or
c) to have onboard all papers/certificates required to perform this Charter,

either within the 6 hours after Notice of Readiness originally tendered or when time would otherwise normally commence under this Charter, then the Original Notice of Readiness shall not be valid. A Notice of Readiness may only be tendered when Customs clearance and/or free pratique have been granted and/or all papers/certificates required are in order in accordance with relevant authority's requirements. Laytime or demurrage, if on demurrage, would then commence in accordance with the terms of this Charter. All time, costs and expenses as a result of delays due to any of the foregoing shall be for Owner's account.

**23.** **Speed**

The vessel shall perform the ballast passage with utmost despatch and the laden passage at _____ knots weather and safe navigation permitting.

Charterer shall have the option to **instruct** the vessel to increase speed with Charterer reimbursing Owner for the additional bunkers consumed, at replacement cost.

Charterer shall also have the option to **instruct** the vessel to reduce speed on laden passage. Additional voyage time shall count against laytime or demurrage, if on demurrage, and the value of any bunkers saved shall be deducted from any demurrage claim Owner may have under this Charter with the value being calculated at original purchase price.

Owner shall provide documentation to fully support the claims and calculations under this clause.

**24.** **Additional Load/Discharge Port(s)**

If the freight in part 1(g) of ExxonMobil Voy 2000 is a lump sum amount and such lump sum freight is connected with a specific number of load / discharge ports and if charterers order the vessel to additional load and/or discharge ports not covered by the agreed lump sum freight.

The following shall apply:

Charterer shall pay for additional interim load / discharge port at cost with additional steaming time to be incurred for such deviation that exceeds direct passage from the first load port to final discharge port. Time shall count from arrival pilot station interim load / discharge port until dropping last outward pilot interim load / discharge port (i.e. no allowance for deduction for shifting even from anchorage to first berth and no deduction for time lost due to tide, sea and weather conditions).

BP distance tables shall be used in both cases since BP distance provide pilot station to pilot station distance. Deviation time shall be calculated using the charter party speed and bunkers consumption as_____tonnes for HFO & _____tonnes for MDO .

Time charged shall be at the demurrage rate in part 1(j) of ExxonMobil Voy 2000.  Additional bunkers consumed shall be paid based upon last bunkered cost and actual ports costs as

incurred offsetting all Owner expenses and cost.  Deviation shall be paid together with freight as per Owners invoice along with agent invoice, whichever is later and shall be supported by hard copy documentation.

The Charterer shall be entitled 6 hours after tendering Notice of Readiness at each port of loading and discharge. Port time used at deviation port will be counted as laytime and to be settled together with Demurrage.

**25.**   **Japan Clause**
   a)   Drawings:
        Owner shall supply Charterer with copies of:
        i)  General Arrangement/Capacity plan; and
        ii)  Piping/Fire Fighting Diagrams

        as soon as possible, but always with 4 working days after subjects lifted on this Charter.

   b)   Supervisor:
        If requested by Charterer, Owner shall ensure a Japanese speaking superintendent, fully authorized by Owner to act on Owner's and/or Master's behalf is available at all ports within Japan to attend safety meetings prior to vessel's arrival at the ports(s) and be in attendance throughout the time in each port and during each cargo operation. All cost is for Owner's account.

**26.**   **Korea Clause**
   a)   Supervisor
        If requested by Charterer, Owner shall ensure a Korean speaking superintendent, fully authorized by Owner to act on Owner's and/or Master's behalf is available at all ports within Korea to attend safety meetings prior to vessel's arrival at the ports(s) and be in attendance throughout the time in each port and during each cargo operation. All cost is for Owner's account.

   b)   Anchorage Dues
        Anchorage dues for the first 72 hrs will be at Owner's account. If berthing may not be available Charterer may require vessel to drift at out port limit. All time from shifting from OPL to berth shall not count as laytime.

   c)   Laytime Clause
        In case the vessel arrives at the quarantine station and tenders NOR to load/discharge between 3 hrs before sunset and 0100 Hrs the next day laytime shall count from 0700 hrs the next day.

**27.**   **Charter Administrative Clause**
   Unless otherwise specifically requested by either Owner or Charterer, no formal Charter Party shall be prepared and signed. The terms and conditions of this Charter Party shall be evidenced by a "Fixture Recap" that is faxed or e-mailed by Charterer's  broker  to Owner and to Charterer. The Fixture Recap shall state the name and date of the pre-printed Charter Party form on which the charter is based, and all amendments, additions and deletions to such Charter Party form. The Fixture Recap shall be confirmed as correct by return fax or e-mail from both parties to Charterer's broker, who shall acknowledge receipt of such confirmations to both parties within two (2) working days after transmittal of the Fixture Recap and/or the lifting of any subjects, whichever is later. A Charter Party in the form approved by both parties and bearing the date of the fixture recap shall be deemed to have been signed by Owner and Charterer.

**28.   Questionnaire(s)**

Owner warrants that any information provided on any Questionnaire(s) requested by Charterer or any other vessel information/details provided by Owner to Charterer is always complete and correct as at the date hereof, and from the time when the obligation to proceed to the loadport attaches and throughout the Charter service, this information is an integral part of this Charter but if there is any conflict between the contents of the Questionnaire(s), or information provided by Owner, and any other provisions of this Charter then such other provisions shall govern.

**29.   ISPS CLAUSE FOR VOYAGE CHARTER PARTIES**

From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to Chapter XI of SOLAS (ISPS code) in relation to the vessel, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS code) shall comply with the requirements of the ISPS code relating to the vessel and "the Company". Upon request, the Owner shall provide a copy of the relevant international ship security certificate (or the interim international ship security certificate) to the Charterer. The Owner shall provide the Charterer with the full style contact details of the Company Security Officer (CSO).

Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owner or "the Company" to comply with the requirements of the ISPS code or this clause shall be for the Owner's account.

The Charterer shall provide the CSO and the Ship Security Officer (SSO/Master with their full style contact details and any other information the owners require to comply with the ISPS code.

Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterer to comply with this clause shall be for the Charterer's account and any delay caused by such failure shall be compensated at the demurrage rate, provided that the delay is not caused by the Owner's failure to comply with its obligations under the ISPS code, the following shall apply:   (i) notwithstanding anything to the contrary provided in this Charter Party, the vessel shall be entitled to tender notice of readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS code; (ii) any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS code shall count as half laytime or half time on demurrage if the vessel is on laytime or demurrage.  If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterer at the one half the demurrage rate.

Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the isps code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be shared between Charterer and Owner unless such costs or expenses result solely from the Owner's negligence.  All measures required by the owners to comply with the ship security plan shall be for the Owner's account.

If either party makes any payment that is for the other party's account according to this clause, the other party shall indemnify the paying party.

**30.   CERTIFICATE OF COMPLIANCE (COC)**

Far East Maritime Company & Gold Star Maritime Company

At all U.S. port(s), Owners shall tender an NOR upon the issuance of a valid Certificate of Compliance (TVEL) even if vessel is all fast at berth / SPM.  Any NOR tendered prior to the issuance of a valid Certificate of Compliance will not be accepted.